**EXHIBIT 1**

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

BANK OF AMERICA, N.A.,

      Plaintiff,

Case No.

v.

RAPID METALS, LLC,

      Defendant.

---

### AFFIDAVIT OF STEVEN M. SIRAVO IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION, TEMPORARY RESTRAINING ORDER AND APPOINTMENT OF A RECEIVER

STATE OF MICHIGAN    )
                         ) ss.:
COUNTY OF OAKLAND    )

Steven M. Siravo, being duly sworn, deposes and says:

1.    I am a Senior Vice President and a Portfolio Manager with plaintiff Bank of America, N.A. ("Bank of America").

2.    I submit this affidavit in support of Bank of America's motion for a temporary restraining order, a preliminary injunction and appointment of a receiver with respect to Rapid Metals, LLC ("Rapid Metals"). If called upon to testify, I can competently testify to the matters set forth in this affidavit.

3.    As set forth below, and based in part upon the accompanying Affidavit of Denise Docal (the "Docal Affidavit"), all of the requested relief is necessary in order to stop Bank of America's borrower, Rapid Metals, from continuing to commit fraud with respect to Bank of America's collateral for a defaulted, asset-based loan made by Bank of America to Rapid Metals.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

## I.    PARTIES

4.    Bank of America is a National Banking Association and a federally insured depository institution, with offices located throughout the United States, including in West Bloomfield, Michigan.  Bank of America's business includes, among other things, commercial lending.  Bank of America's commercial loans include asset-based revolving loans where a borrower, such as Rapid Metals, is entitled to request loans based upon a formula percentage of its accounts receivable and inventory.

5.    Rapid Metals is a Michigan limited liability company with its principal place of business at 9031 Orchard Lake Rd., Suite 101, West Bloomfield, Michigan, that operates as a distributor of steel and non-ferrous metals and specializes in sourcing and reselling secondary rolled, treated and scrap metals ("coils"), including primarily steel but also aluminum from major steel mills, to third parties that use them in other products.  Through outside processors, Rapid Metals offers slitting, blanking, pickling, cold reduction, edge condition, temper passing and other forms of processing to its customers.  Rapid Metals services a wide array of industries.

6.    Rapid Metals' primary assets include its accounts receivable and its inventory.  Its inventory consists of rolled metal stored at approximately 80 locations in multiple states.  It owns inventory that is stored at outside processors (near their clients/mills), but it does not own or lease any of those facilities.  Instead, Rapid Metals purchases steel and/or other metals and has them processed (slit, galvanized, etc.) to a customer's specifications by those outside processors at their places of business.

## II.    BANK OF AMERICA'S LOANS TO RAPID METALS

7.    On November 9, 2022, Bank of America, as lender, and Rapid Metals, as borrower, entered into a Loan and Security Agreement, in which Bank of America extended a revolving,

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

secured line of credit up to a maximum of $30,000,000 to Rapid Metals (the "Loan Agreement"). A copy of the Loan Agreement is attached hereto as "Exhibit A."

8. At all times since November 9, 2022, Bank of America has made loans to Rapid Metals under the Loan Agreement (the "Loans"). All of Rapid Metals' "Obligations" under the Loan Agreement are secured by certain "Collateral," which includes all of Rapid Metals' "Personal Property," and expressly includes, among other things, "all Accounts" (including accounts receivable), "all Deposit Accounts," "all Documents," "all Goods, including Inventory, Equipment and fixtures," "all monies," and "all books and records (including customer lists, files, correspondence, tapes, computer programs, print-outs and computer records) pertaining to the foregoing" (the "Collateral") (Loan Agreement § 7.1).

9. In an asset-based revolving loan, a borrower, such as Rapid Metals, is entitled to borrow amounts from the bank under a collateral-based formula, referred to as the "Borrowing Base," up to a maximum amount. Here, the Loan Agreement provides that, if the Loan was not in default and all other applicable requirement are met, Rapid Metals is entitled to borrow from Bank of America up to the lesser of a "Maximum Amount" of $30,000,000 and the amount of the "Borrowing Base." At all times since April 1, 2023, the "Borrowing Base" has been equal to (i) 85% of Rapid Metals' "Eligible Accounts" (accounts receivable) plus (ii) the sum of the lesser of 85% of the "net ordinary liquidation value" of Rapid Metals' "Eligible Inventory" and 70% of the value of its "Eligible Inventory," for four different types of inventory, (iii) minus "Reserves." (Loan Agreement § 1.1). To be "Eligible," an "Account" must meet several requirements, including, among other requirements, that it not be "unpaid for more than 60 days after the original due date, or more than 90 days after the original invoice date." (Loan Agreement § 1.1). The Loan Agreement defined "Eligible Inventory" as "Inventory owned by Borrower that Lender, in its

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

discretion, deems to be Eligible Inventory," and includes detailed requirements for "Inventory" to constitute "Eligible Inventory."

10.     In order to confirm that the Collateral exists and is in compliance with the Loan Agreement, that the borrower is not borrowing more than it is entitled to borrow, and that the borrower is complying with its other obligations under the loan documents, the borrower regularly reports its collateral position, and thereby its entitlement to request loans, on a "Borrowing Base Report," listing its eligible receivables and inventory, and also provides other documentation. The borrower represents and warrants to the bank the reports it furnishes are accurate and that with respect to accounts receivable each account is for a bona fide completed sale in accordance with the terms of each invoice. Bank of America is entitled to, and in fact does, rely on the truth of these representations and the fact of the warranty in making every single advance under the loan.

11.     Here, the Loan Agreement requires Rapid Metals to provide certain documentation and information to Bank of America. For example, under the Loan Agreement, Rapid Metals is required to provide the following documents to Bank of America by the 15th day of each month, or weekly following a default:

- a "Borrowing Base Report," certified by Rapid Metals, providing among other things, accurate calculations and breakdowns of Rapid Metals' inventory and accounts receivable as of the close of business on the last day of the previous month;

- a detailed aged trial balance for all accounts receivable as of the end of the preceding month, together with back-up documentation requested by Bank of America;

- a monthly roll forward report of all accounts receivable from the previous month; and

- inventory reports, generally submitted in the form of a "perpetual inventory," together with inventory reconciliation reports.

4

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

(Loan Agreement §§ 8.1, 8.2.1, 8.3.1).

12.     Rapid Metals is also required to provide other documentation and information to Bank of America periodically, including, for example, financial statements and "Compliance Certificates," and to comply with requests by Bank of America for documentation and information permitted under the Loan Agreement. (Loan Agreement § 10.1.2).

13.     Many asset-based loans include requirements, often subject to exceptions for payroll accounts, that payments to the borrower by customers and others on accounts receivable and otherwise be paid into accounts controlled by the bank. The purpose of this requirement is to ensure that the lender has control of the collateral for the loan.

14.     Here, under the Loan Agreement, Rapid Metals was required to disclose to Bank of America and grant Bank of America control of all deposit accounts it maintained other than the "Comerica Account" as defined below. (Loan Agreement §§ 1.1, 5.5, 8.5(a)). When Rapid Metals receives any payments – including, for among other payments, payments on accounts receivable from a customer – the payments are required to be deposited no later than the next business day into a "special account" established by Rapid Metals at Bank of America over which Bank of America has "exclusive control for withdrawal purposes" (the "Dominion Account"). (Loan Agreement §§ 1.1, 5.5, 8.2.3, 8.5(a)). Rapid Metals is required to "maintain the Dominion Account pursuant to a lockbox or other arrangements satisfactory to Lender, establishing Lender's control over and Lien on the lockbox and Dominion Account, and requiring immediate deposit of remittances received in the lockbox to the Dominion Account." (Loan Agreement § 8.2.3).

15.     However, Bank of America recognizes that Rapid Metals is required to meet payroll. Consequently, the Loan Agreement allows Rapid Metals to maintain a separate deposit account at Comerica Bank (the "Comerica Account") that is not subject to the foregoing

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

requirements, provided that (i) no "Default" or "Event of Default" exists under the Loan Agreement, (ii) the Comerica Account is used "exclusively for payroll purposes," and (iii) the balance does not exceed $100,000 at any time. (Loan Agreement § 8.5(b)).

16.     Like the agreements governing most other asset-based lending relationships, the Loan Agreement also sets forth certain events of default. The Loan Agreement provides that any incorrect or material representation or failure to perform a covenant constitutes an Event of Default. One type of default is a default in payment. However, an "Event of Default" may also occur many other ways – for example, when "[a]ny representation, warranty or other written statement of [Rapid Metals] made in connection with any Loan Documents or transactions contemplated thereby is incorrect or misleading in any material respect when given," or "[Rapid Metals] . . . breaches or fails to perform a covenant contained in a Loan Document" (Loan Agreement §§ 11.1(b), (c)).

17.     After an Event of Default, Section 11.2 of the Loan Agreement provides Bank of America with several remedies: It can declare any Obligations immediately due and payable, without the need for diligence, presentment, demand, protest or notice of any kind. (Loan Agreement § 11.2(a)). It also holds the right to "terminate, reduce or condition the Commitment or Loan, or adjust the Borrowing Base." (Loan Agreement § 11.2 (b)).

18.     In addition, Bank of America has the right to exercise any other rights or remedies under any agreement, including the rights and remedies of a secured party under the Uniform Commercial Code. Those rights include: (i) the right to take possession of any Collateral; (ii) the right to require Borrower to assemble Collateral, at Rapid Metals' expense and to make it available to Bank of America at a place designated by Bank of America; and (iii) the right to enter any

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

premises where Collateral is located and store Collateral on such premises until sold. (Loan Agreement § 11.2(d)).

19.     The Loan Agreement provides for more frequent and increased reporting requirements during an "Increased Reporting Trigger Period." The Loan Agreement defines an "Increased Reporting Trigger Period" as "the period (a) commencing on the day that (i) a Default or Event of Default occurs, or (ii) Availability is less than 20% of the Maximum Amount; and (b) continuing until, during each of the preceding 60 consecutive days, (i) no Default or Event of Default has existed and (ii) Availability has been more than 20% of the Maximum Amount." (Loan Agreement § 1.1).

20.     During an "Increased Reporting Trigger Period," Rapid Metals is required to deliver to Bank of America:

(a)     "a weekly Borrowing Base Report, together with a gross Accounts and Inventory report on or before the Tuesday of each week, reflecting Inventory and outstanding Accounts as of the end of the preceding week (without any change to ineligible Accounts or Inventory)" (Loan Agreement § 8.1);

(b)     "a detailed aged trial balance of [Eligible] Accounts as of the end of the preceding month, specifying each Account's Account Debtor name and address, amount, invoice date and due date, showing any discount, allowance, credit, authorized return or dispute, and including such proof of delivery, copies of invoices and invoice registers, copies of related documents, repayment histories, status reports and other information as Lender may reasonably request… on a weekly basis by Tuesday of each week for the immediately preceding week" (Loan Agreement § 8.2.1); and

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

(c)     at the same time, a "weekly roll forward report."  (Loan Agreement § 8.2.1).

21.     Section 11.3 of the Loan Agreement also grants Bank of America an irrevocable, non-exclusive license to use any or all intellectual property of the Borrower, including its computer hardware and software, "in advertising for sale, marketing, selling, collecting, completing manufacture of, or otherwise exercising any rights or remedies with respect to, any Collateral." (Loan Agreement § 11.3).

## III.  RAPID METALS' DEFAULTS

22.     Rapid Metals has defaulted under the Loan Agreement in numerous respects. Certain of those defaults were set forth in a notice of default dated June 12, 2023.  Specifically, on June 12, 2023, Jang Kim of Bank of America delivered a "Notice of Default" to Rapid Metals by emailing it to Daniel Butler, the managing member of Rapid Metals, putting it on notice of several defaults under the Loan Agreement (the "June 12, 2023 Notice of Default").  A copy of the June 12, 2023 Notice of Default is attached hereto as "Exhibit B."

23.     The June 12, 2023 Notice of Default specifically identifies the following items which Rapid Metals was required, but failed, to deliver to Bank of America:

(a)     Rapid Metals' reviewed annual balance sheet for the fiscal year ending December 31, 2022, together with the Related Reporting, as required by Section 10.1.2(a) of the Loan Agreement;

(b)     Rapid Metals' reviewed quarterly balance sheets for the fiscal quarters ending December 31, 2022 and March 31, 2023, together with the Related Reporting, as required by Section 10.1.2(b)(i) of the Loan Agreement;

(c)     Rapid Metals' Compliance Certificate for the months ending November 30, 2022, December 31, 2022, January 31, 2023, February 28, 2023, March 31, 2023, and April 30, 2023, as required by Section 10.1.2(c) of the Loan Agreement;

(d)     Projections of Rapid Metals' consolidated balance sheets, results of operations, cash flow and Availability for the fiscal year ending December 31, 2023, covering a time period acceptable to Bank of America month by month, and for the next three fiscal years, year by year, as required by Section 10.1.2(f) of the Loan Agreement; and

8

(e)   Rapid Metals' weekly Borrowing Base Reports for each week in the month of May, as well as the Borrowing Base Report for the week ending June 2, 2023, in each case, as required by Sections 8.1, 8.2 and 10.1.2(e) of the Loan Agreement.

24.    In the June 12, 2023 Notice of Default, Bank of America also placed Rapid Metals on notice that an "Increased Reporting Trigger Period" had commenced, "which required [Rapid Metals] to deliver Borrowing Base Reports on a weekly basis." Bank of America also placed Rapid Metals on notice that, unless the defaults were resolved, Bank of America reserved the right to declare the entire loan due and payable and to exercise its remedies under the Loan Agreement, including by taking possession of the Collateral securing the loan, selling it, and using the proceeds to pay off the debt.

## IV.   **THE DISCOVERY OF RAPID METALS' SERIOUS OVERSTATEMENT AND MANIPULATION OF ACCOUNTS RECEIVABLE AND INVENTORY DURING THE FIELD EXAMINATION CONDUCTED BY DENISE DOCAL**

25.    A field examination is an evaluation that is conducted by or for a bank or other asset-based lender of the collateral and "borrowing base" supporting the lender's loans to its borrower, as well as other aspects of the borrower, so that the bank or lender can determine whether to make a loan, or to continue lending money, to the borrower. During a field examination, the field examiner reviews the collateral for the loan, including, for example, inventory, accounts receivable and other assets, as well as other aspects of the borrower's financial condition, business operations, liabilities, and compliance with loan covenants. Like most asset-based lenders, Bank of America uses "field examinations" to confirm the existence, quantity, status and eligibility (to be part of the "borrowing base") of the borrower's inventory and accounts receivables, the status of the lender's collateral for the loans, and the borrower's compliance with the loan documents.

26.    In mid-June of 2023, Bank of America retained D4, LLC and its principal and chief executive officer, Denise Docal, to perform a field examination of Rapid Metals.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

27.     As set forth in the Docal Affidavit in support of the Motion, Ms. Docal concluded that there are numerous serious and material misrepresentations and discrepancies amounting to millions of dollars in Rapid Metals' reporting of its inventory and accounts receivable to Bank of America.  Those misrepresentations and discrepancies have rendered the financial records regarding Rapid Metals' inventory and accounts receivable completely unreliable.  As a result of the serious misrepresentations and misstatements in Rapid Metals' financial reporting and record-keeping, Rapid Metals' inventory and accounts receivable appear to be substantially overstated, and a material portion of its inventory which is reported at approximately 80 locations is non-existent.  Moreover, Rapid Metals' misrepresentations to Bank of America have enabled Rapid Metals to borrow substantial sums of money from Bank of America to which Rapid Metals was not entitled.

## V.    RAPID METALS' MISUSE OF THE COMERICA ACCOUNT

28.     Rapid Metals has also been violating the Loan Agreement by misusing the Comerica Account.  As noted above, Loan Agreement permits Rapid Metals to use the Comerica Account only if  (i) no "Default" or "Event of Default" exists under the Loan Agreement, (ii) the Comerica Account is used "exclusively for payroll purposes," and (iii) the balance does not exceed $100,000 at any time.  (Loan Agreement § 8.5(b)).  However, a review of the statements from the Comerica Account reveals that Rapid Metals is using that account to accept ACH transfers and make payments that are obviously not for payroll purposes – thereby potentially placing millions of dollars of collections beyond the scope of Bank of America's protected lien.  In addition, Rapid Metals continued to use that account after the occurrence of numerous "Defaults" and "Events of Default," and the account balance repeatedly exceeded $100,000.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

29. Copies of statements for the Comerica Account for April and May of 2023 are attached hereto as "Exhibit C." Those statements indicate that numerous large amounts were paid by customers of Rapid Metals by electronic transfers to this account, including, for example, payments of $500,000 on April 14, 2023, and of $600,000 on April 30, 2023, by Valiant Steel & Equipment.

30. Those statements also show that In addition, Rapid Metals used the account to make large payments to Steel Dynamics Sinton Corp., a steel producer, including, for example, $1,312,807.23 on April 26, 2023, and $2,343,973.89, on May 19, 2023. In addition, Rapid Metals paid checks in the amounts of $200,000.00, $100,000.00, $120,000.00, and $200,000.00, on April 3, 2023, April 13, 2023, April 17, 2023, and April 25, 2023, respectively, and in the amounts of $450,000, $350,000, $320,000, 100,000, and $350,000, on May 4, 2023, May 9, 2023, May 16, 2023, May 24, 2023, and May 31, 2023, respectively.

31. I have not seen anything indicating that any of these payments were for payroll purposes.

## VI.   THE NOTICE OF ACCELERATION

32. The serious and material misrepresentations and discrepancies in the borrowing base reports and supporting documentation that Rapid Metals delivered to Bank of America which are outlined in the Docal Affidavit, as well as Rapid Metals' misuse of the Comerica Account, resulted in "Defaults" and "Events of Default" under the Loan Agreement that went far beyond the "Events of Default" set forth in the June 12, 2023 Notice of Default. For example, each misrepresentation constituted an "Event of Default" under the Loan Agreement.

33. Consequently, on July 5, 2023, Bank of America representatives personally delivered to Mr. Butler the Notice of Additional Events of Default, Acceleration and Demand for

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Payment, a copy of which is annexed hereto as "Exhibit D" (the "July 5, 2023 Notice of Acceleration").

34.     As detailed in the July 5, 2023 Notice of Acceleration, Rapid Metals further defaulted under the Loan Agreement in the following respects:

(a)     Following [Bank of America's] review of certain documents provided by [Rapid Metals] to Lender's field examiner (including, without limitation, invoices, bills of lading and various collateral reports) and as confirmed by the [Bank of America's] field examiner, [Bank of America] has determined that [Rapid Metals] has repeatedly submitted Borrowing Base Reports that (1) include Accounts as Eligible Accounts that are not in fact Eligible Accounts or (2) increased the value of Accounts, in each case, thereby inflating the amount of the Borrowing Base based on material misrepresentations as to an Account's eligibility or amount in order to induce [Bank of America] to increase its Loans to [Rapid Metals]. Each instance of reporting false, misleading and/or inaccurate information by [Rapid Metals] to [Bank of America] with respect to its Accounts constituted an Event of Default under the Loan Agreement, including, without limitation, under Section 9.2 and Section 11.1(b) thereof.

(b)     Following [Bank of America's] review of inventory reporting documents provided by [Rapid Metals] to [Bank of America's] field examiner, as well as the results of an inventory test count performed at one of [Rapid Metals'] locations, [Bank of America] has determined that [Rapid Metals] repeatedly submitted Borrowing Base Reports that overstated the value of Inventory at certain locations by assigning value to Inventory that was not present at such locations or which had a zero quantity. Each instance of reporting false, misleading and/or inaccurate information by [Rapid Metals] to [Bank of America] with respect to its Inventory constituted an Event of Default under the Loan Agreement, including, without limitation, under Sections 8.3.1, 9.2 and 11.1(b) thereof.

(c)     Following [Bank of America's] review of bank statements provided by [Rapid Metals] to [Bank of America's] field examiner in respect of the Comerica Account, [Bank of America] has determined that (1) [Rapid Metals] is not using the Comerica Account exclusively for payroll purposes and repeatedly uses the Comerica Account as a collection account and disbursement/operating account, and (2) [Rapid Metals] has repeatedly allowed the balance to exceed $100,000 and has not swept excess amounts to the Dominion Account. Each of the foregoing constitutes an Event of Default under Sections 8.5(b) and 10.1.8 of the Loan Agreement.

35.     Based upon the defaults which Bank of America had previously noticed in its June 12, 2023 Notice of Default as well as those in the July 5, 2023 Notice of Acceleration, in the July 5, 2023 Notice of Acceleration, Bank of America (a) terminated the loan commitment, and (b)

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

accelerated the entire unpaid principal amount of the Loan and all interest accrued and unpaid thereon, and all other obligations owing under the Loan Agreement and Loan Documents. (July 5, 2023 Notice of Acceleration at 2).

36. As of today, the outstanding principal and accrued interest in respect of the Loan is $19,873,528.57, plus interest, attorneys fees, costs, expenses and other amounts accrued and accruing.

37. The July 5, 2023 Notice of Acceleration also demanded, under Section 9-609 of the Uniform Commercial Code, that Rapid Metals turn over all Collateral for repossession. This includes complete access to Rapid Metals' books and records.

38. However, I understand that these books and records are stored on a secure password-protected account on one or more cloud-based servers, to which only a small group of people – including Mr. Butler – have access.

## VII.    BANK OF AMERICA'S MEETING WITH MR. BUTLER ON JULY 5, 2023

39. On July 5, 2023, John McManus (Bank of America's Market Executive for Business Banking for Michigan), Tim Boates (President and a Member of RAS Management Advisors, LLC), and I met with Mr. Butler to discuss the Loan Agreement and Mr. Butler's material misrepresentations, misstatements and other improper conduct. That meeting took place at the Merrill Lynch Office in Farmington Hills, Michigan, at about 11:30 AM.

40. At the beginning of the meeting, I handed the July 5, 2023 Notice of Acceleration to Mr. Butler. During that meeting, we confronted Mr. Butler with the allegations recounted above based in part upon Ms. Docal's field examination, and stated that, based upon Rapid Metals' fraudulent conduct and its numerous "Defaults" and "Events of Default" under the Loan Agreement, Bank of America would be terminating the Loan Agreement and no longer lending to

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Rapid Metals. We requested that Mr. Butler agree to cede control of Rapid Metals' operations to Bank of America, and provide it with unfettered access to Rapid Metal's operations, but that Mr. Butler can assist Bank of America with matters relating to Rapid Metals. Mr. Butler stated that he needed to speak with his attorney. Mr. Butler was advised that Bank of America would be commencing legal action if Bank of America did not hear from him by 4 p.m. on July 5, 2023.

## VIII. THE NEED FOR A PRELIMINARY INJUNCTION, A TRO AND APPOINTMENT OF A RECEIVER

41. Based upon Mr. Butler's extensive manipulation of Rapid Metals' financial records and his fraudulent overstatement of its assets – including his actions in certifying the existence of more than $2 million of nonexistent, zero-quantity receivables, and submission of receivable aging reports and Borrowing Base Reports that were fraudulent in numerous respects – as well as Mr. Butler's misuse of the Comerica Account, there is every reason to believe that he will continue to manipulate Rapid Metals' records of his inventory and accounts receivable, and that he will attempt to circumvent Bank of America's security interest in, and attempt to steal, the Collateral. If he does so, this will irreparably damage Bank of America's interests in the Collateral, render any action for money damages against Rapid Metals futile, and deprive Bank of America of the ability to accurately assess the value and location of Rapid Metals' assets.

42. As it stands, Mr. Butler's actions have made it impossible, or virtually impossible, for Bank of America to verify the information previously provided by Rapid Metals and Mr. Butler or information that might be provided in the future. The risk of further manipulation is simply too high given the demonstrable evidence it has occurred at such a systematic level. Bank of America can only have recourse to accurate and genuine information to safeguard its interests if the Court acts now to prevent Mr. Butler from manipulating information, including that which he has not provided Bank of America.

14

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

43.     It is my understanding that Mr. Butler is solely responsible for tracking and reporting accounts receivable and inventory to Bank of America.  In that role, Mr. Butler is in a position to further erase or change inventory records.  Given that his books and records are stored in the cloud and his inventory is spread out through 80 locations around the country in facilities he does not lease or own, which are owned by steel processing companies with which Mr. Butler has a preexisting business relationship, retaking possession of the Collateral and understanding what Collateral exists will be uniquely challenging.   Mr. Butler could easily alter records and electronically sell inventory that Bank of America does not know about.  Mr. Butler has altered records without compunction in the past, and the only reason he did not get away with it was because he acted quickly and sloppily.  Accordingly, there is no reason to think he will not try again unless he is required to turn over the passwords to the cloud systems which he relies upon to conduct his business (and to defraud Bank of America).  Simply locking Mr. Butler out of his office will not suffice.

44.     Mr. Butler's previous actions demonstrate a real and ongoing risk that without judicial intervention, Bank of America will never have a real view into the financial and operational state of Rapid Metals, which will greatly hamper its ability to exercise its rights under the Loan Agreement and the Uniform Commercial Code to liquidate the Collateral.

45.     Therefore, immediate court intervention is necessary to prevent further erosion of the value of whatever Collateral exists at its uninflated cost and potential destruction of important financial records.   Bank of America needs to be able to access Rapid Metals' premises, its books and records, and its computer systems, and a Receiver is necessary to prevent any further manipulation or destruction of data.  A comprehensive audit and review of Rapid Metals' financial affairs, beyond the preliminary findings of our field examiner, is the only way to truly account for

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

the Collateral to allow Bank of America to effectively liquidate the Collateral and recover whatever portion of those assets Rapid Metals actually has.

46.     Accordingly, the Motion should be granted.

_Steven M. Siravo_
Steven M. Siravo

Subscribed and sworn to before me this
____6th____ day of July, 2023

_Donna Lynn Bragg_
Notary Public

DONNA LYNN BRAGG
NOTARY PUBLIC, STATE OF MI
COUNTY OF WAYNE
MY COMMISSION EXPIRES Jun 25, 2025
ACTING IN COUNTY OF Oakland

16

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

# Exhibit A
(Loan and Security Agreement)

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

---

# LOAN AND SECURITY AGREEMENT

Dated as of November 9, 2022

---

**RAPID METALS, LLC,**
as Borrower

and

---

**BANK OF AMERICA, N.A.**,
as Lender

---

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**TABLE OF CONTENTS**

Page

Section 1. DEFINITIONS; RULES OF CONSTRUCTION ............................................................ 1
   1.1. Definitions ........................................................................................................... 1
   1.2. Terms .................................................................................................................. 10
   1.3. Uniform Commercial Code .................................................................................. 10
Section 2. CREDIT FACILITIES ...................................................................................................... 10
   2.1. Commitment ........................................................................................................ 10
   2.2. [Reserved] ........................................................................................................... 11
Section 3. INTEREST, FEES AND CHARGES ................................................................................ 11
   3.1. Interest ................................................................................................................. 11
   3.2. Fees ...................................................................................................................... 11
   3.3. Computation of Interest, Fees, Yield Protection ................................................. 11
   3.4. Reimbursement Obligations ................................................................................ 12
   3.5. Illegality; Interest Rate Not Ascertainable .......................................................... 12
   3.6. Increased Costs; Capital Adequacy ..................................................................... 12
   3.7. Funding Losses .................................................................................................... 13
   3.8. Maximum Interest ............................................................................................... 13
Section 4. LOAN ADMINISTRATION ............................................................................................ 13
   4.1. Manner of Borrowing and Funding Loans .......................................................... 13
   4.2. Effect of Termination .......................................................................................... 14
Section 5. PAYMENTS ...................................................................................................................... 14
   5.1. General Payment Provisions ................................................................................ 14
   5.2. Repayment of Loans ............................................................................................ 14
   5.3. Payment of Other Obligations ............................................................................. 14
   5.4. Marshaling; Payments Set Aside ......................................................................... 14
   5.5. Dominion Account ............................................................................................... 14
   5.6. Taxes .................................................................................................................... 14
   5.7. Account Stated ..................................................................................................... 15
Section 6. CONDITIONS PRECEDENT ........................................................................................... 15
   6.1. Conditions Precedent to Initial Loans ................................................................. 15
   6.2. Conditions Precedent to All Credit Extensions ................................................... 16
Section 7. COLLATERAL .................................................................................................................. 17
   7.1. Grant of Security Interest ..................................................................................... 17
   7.2. Lien on Deposit Accounts; Cash Collateral ........................................................ 17
   7.3. Reserved ............................................................................................................... 18
   7.4. Other Collateral ................................................................................................... 18
   7.5. Limitations ........................................................................................................... 18
   7.6. Further Assurances; Extent of Liens .................................................................... 18
Section 8. COLLATERAL ADMINISTRATION .............................................................................. 18
   8.1. Borrowing Base Reports ...................................................................................... 18
   8.2. Accounts .............................................................................................................. 19
   8.3. Inventory .............................................................................................................. 19
   8.4. Equipment ............................................................................................................ 20
   8.5. Deposit Accounts ................................................................................................. 20
   8.6. General Provisions ............................................................................................... 20
   8.7. Power of Attorney ................................................................................................ 21
Section 9. REPRESENTATIONS AND WARRANTIES .................................................................. 21
   9.1. General Representations and Warranties .............................................................. 21
   9.2. Complete Disclosure ............................................................................................ 25
Section 10. COVENANTS AND CONTINUING AGREEMENTS ................................................... 25

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

| | | |
|---|---|---|
| 10.1. | Affirmative Covenants | 25 |
| 10.2. | Negative Covenants | 27 |
| 10.3. | Financial Covenants | 29 |

Section 11. EVENTS OF DEFAULT; REMEDIES ON DEFAULT ........................................ 29

| | | |
|---|---|---|
| 11.1. | Events of Default | 29 |
| 11.2. | Remedies upon Default | 30 |
| 11.3. | License | 31 |
| 11.4. | Setoff | 31 |
| 11.5. | Remedies Cumulative; No Waiver | 31 |

Section 12. MISCELLANEOUS ........................................ 31

| | | |
|---|---|---|
| 12.1. | Amendments and Waivers | 31 |
| 12.2. | Indemnity | 32 |
| 12.3. | Notices and Communications | 32 |
| 12.4. | Performance of Borrower's Obligations | 33 |
| 12.5. | Credit Inquiries | 33 |
| 12.6. | Severability | 33 |
| 12.7. | Cumulative Effect; Conflict of Terms | 33 |
| 12.8. | Counterparts | 33 |
| 12.9. | Entire Agreement | 34 |
| 12.10. | No Control; No Fiduciary Responsibility | 34 |
| 12.11. | Confidentiality | 34 |
| 12.12. | Governing Law | 34 |
| 12.13. | Consent to Forum | 35 |
| 12.14. | Waivers by Borrower | 35 |
| 12.15. | Patriot Act Notice | 35 |
| 12.16. | Acknowledgement Regarding Any Supported QFCs | 35 |
| 12.17. | NO ORAL AGREEMENT | 36 |

## LIST OF SCHEDULES

| | |
|---|---|
| Schedule 8.5 | Deposit Accounts |
| Schedule 8.6.1 | Business Locations |
| Schedule 9.1.4 | Names and Capital Structure |
| Schedule 9.1.5 | Real Estate in Special Flood Hazard Zone |
| Schedule 9.1.11 | Patents, Trademarks, Copyrights and Licenses |
| Schedule 9.1.14 | Environmental Matters |
| Schedule 9.1.15 | Restrictive Agreements |
| Schedule 9.1.16 | Litigation |
| Schedule 9.1.18 | Pension Plans |
| Schedule 9.1.20 | Labor Relations |
| Schedule 10.2.1 | Borrowed Money |
| Schedule 10.2.2 | Existing Liens |
| Schedule 10.2.13 | Restrictive Agreements |
| Schedule 10.2.16 | Existing Affiliate Transactions |

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

# LOAN AND SECURITY AGREEMENT

**THIS LOAN AND SECURITY AGREEMENT** (this "Agreement") is dated as of November 9, 2022, between **RAPID METALS, LLC**, a Michigan limited liability company ("Borrower") and **BANK OF AMERICA, N.A.**, a national banking association ("Lender").

# R E C I T A L S:

Borrower has requested that Lender provide a credit facility to Borrower to finance its business enterprise. Lender is willing to provide the credit facility on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, for valuable consideration hereby acknowledged, the parties agree as follows:

## SECTION 1.  DEFINITIONS; RULES OF CONSTRUCTION

**1.1.  Definitions.**  In addition to terms defined elsewhere in this Agreement, the following terms have the meanings set forth below:

Account: as defined in the UCC, including all rights to payment for goods sold or leased, or for services rendered.

Account Debtor: a Person obligated under an Account, Chattel Paper or General Intangible.

Accounts Formula Amount: means (a) prior to the Stepdown Date, the sum of: (i) 90% of Eligible Credit Insured Accounts; plus (ii) 85% of Eligible Accounts that are not credit insured; and (b) after the Stepdown Date, 85% of Eligible Accounts.

Affiliate: with respect to a specified Person, another Person that directly, or indirectly through intermediaries, Controls or is Controlled by or is under common Control with the Person specified. "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.

Applicable Margin: means 2.00%.

Availability: the Borrowing Base minus Revolver Usage.

Average Daily Availability: shall mean, for any period of determination, the average daily Availability during such period of determination.

Bank Product: any of the following products, services or facilities extended to Borrower or any of its Affiliates by Lender or any of its Affiliates: (a) Cash Management Services; (b) Swaps; and (c) commercial credit card and merchant card services.

Bank Product Debt: debt, obligations and other liabilities of Borrower and its Affiliates with respect to Bank Products.

Bank Product Reserve: the aggregate amount of reserves established by Lender from time to time in its discretion in respect of Bank Product Debt.

Base Rate: for any day, a per annum rate equal to the greater of (a) the Prime Rate for such day;

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

(b) the Federal Funds Rate for such day, plus 0.50%; or (c) the BSBY Rate for such day, plus 1%. In no event shall the Base Rate be less than zero.

Base Rate Loan: a Loan that bears interest based on the Base Rate.

Beneficial Ownership Certification: a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation, in form and substance satisfactory to Lender.

Beneficial Ownership Regulation: 31 C.F.R. §1010.230.

Benefit Plan: any (a) employee benefit plan (as defined in ERISA) subject to Title I of ERISA, (b) plan (as defined in and subject to Section 4975 of the Code), or (c) Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such employee benefit plan or plan.

Borrowed Money: with respect to any Obligor, without duplication, its (a) debt that (i) arises from the lending of money by any Person to such Obligor; (ii) is evidenced by notes, drafts, bonds, debentures, credit documents or similar instruments; (iii) accrues interest or is a type upon which interest charges are customarily paid (excluding trade payables owing in the ordinary course of business); or (iv) was issued or assumed as full or partial payment for Property; (b) capital leases; (c) reimbursement obligations with respect to letters of credit; and (d) guaranties of any debt of the foregoing types owing by another Person.

Borrower Materials: all information, reports, financial statements and materials delivered by Obligors under the Loan Documents, including Borrowing Base Reports, Compliance Certificates and Notices of Borrowing.

Borrowing Base: on any date of determination, an amount equal to the lesser of (a) the Commitment; or (b) the sum of (i) the Accounts Formula Amount, plus (ii) the Inventory Formula Amount, minus (iii) Reserves, provided that, for the first sixty (60) days following the Closing Date, Lender agrees that any Rent and Charges Reserve shall not exceed $400,000 and, from and after the sixtieth (60th) day following the Closing Date, the Rent and Charges Reserve will be determined by Lender, in its discretion, based on whether Borrower has delivered satisfactory Lien Waivers for its inventory locations.

Borrowing Base Report: a report of the Borrowing Base and Average Daily Availability by Borrower, in form and substance satisfactory to Lender.

BSBY Loan: a Loan that bears interest based on BSBY Rate.

BSBY Rate: for each day in a calendar month, a per annum rate equal to the BSBY Screen Rate for a one month term, determined by Lender two Business Days prior to the first day of such calendar month (or if such rate is not published on the determination date, the applicable BSBY Screen Rate on the Business Day immediately preceding such date); provided, that in no event shall the BSBY Rate be less than zero. If such rate is not available for any reason or Lender determines to incorporate or adopt a new interest rate to replace the BSBY Rate in credit agreements, then Lender may replace BSBY Screen Rate with an alternate interest rate and adjustment, if applicable, in its discretion, giving due consideration to any evolving or then existing conventions for such rate and adjustment. Lender may, from time to time, make conforming, technical, administrative or operational changes as it deems appropriate to reflect adoption, implementation and administration of a successor rate and adjustment. Notwithstanding anything to the contrary in any Loan Document, Modification of a Loan Document implementing a conforming change will be effective upon notice by Lender to Borrower without further action or consent of any other party.

BSBY Screen Rate: the Bloomberg Short-Term Bank Yield Index rate administered by Bloomberg Index Services Limited and published on the applicable Reuters screen page (or such other commercially available source designated by Lender in its discretion from time to time).

-2-

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Business Day: any day except a Saturday, Sunday or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, North Carolina or New York City.

Cash Collateral: cash, and any interest or other income earned thereon, that is delivered to Lender to Cash Collateralize any Obligations.

Cash Collateral Account: a demand deposit, money market or other account maintained with Lender and subject to Lender's Liens.

Cash Collateralize: delivery of cash to Lender, as security for the Obligations, in an amount equal to Lender's good faith estimate of the amount due or to become due.

Cash Management Services: services relating to operating, collections, payroll, trust, or other depository or disbursement accounts, including automated clearinghouse, e-payable, electronic funds transfer, wire transfer, controlled disbursement, overdraft, depository, information reporting, blocked account, lockbox and stop payment services.

Change of Control: (a) Permitted Holders cease to collectively own and control, beneficially and of record, directly or indirectly, 75% of all Equity Interests in Borrower; (b) a change in the majority of directors or managers of Borrower during any 24 month period, unless approved by the majority of directors or managers serving at the beginning of such period; or (c) the sale or transfer of all or substantially all assets of Borrower.

Claims: all claims, liabilities, obligations, losses, damages, penalties, judgments, proceedings, interest, costs and expenses of any kind (including reasonable attorneys' fees) at any time (including after payment in full of the Obligations) incurred by or asserted against an Indemnitee, relating to any (a) Loan, Loan Document or related transaction, (b) action taken or omitted in connection with this credit facility, (c) existence or perfection of Liens or realization on Collateral, (d) exercise of rights or remedies under a Loan Document or applicable law, (e) failure by an Obligor to perform or observe any term of a Loan Document, or (f) Lender's reliance on an electronic signature, record or Communication, in each case including all costs and expenses relating to any investigation, litigation, arbitration or other proceeding (including an appeal or insolvency proceeding), whether or not an Indemnitee or Obligor is a party.

Collateral: all Property described in **Section 7.1**, and all other Property that now or hereafter secures (or is intended to secure) any Obligations.

Commitment: Lender's obligation to make Loans in an aggregate amount up to the Maximum Amount.

Communication: any notice, request, election, representation, certificate, report, disclosure, statement, authorization, approval, consent, waiver, document, amendment, or transmittal of information of any kind in connection with this credit facility, including any Loan Document or Borrower Materials.

Compliance Certificate: a certificate delivered by a knowledgeable officer of Borrower calculating and certifying compliance with **Section 10.3**, in form and substance satisfactory to Lender.

Default: an event or condition that, with the lapse of time or giving of notice, would constitute an Event of Default.

Default Rate: for any Obligation (including, to the extent permitted by law, interest not paid when due), 2.00% plus the interest rate or fee otherwise applicable thereto.

Deposit Account Control Agreement: a control agreement satisfactory to Lender executed by an institution maintaining a Deposit Account for an Obligor, to perfect Lender's Lien on such account.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Designated Locations: means the ten (10) locations listed on Schedule 8.6.1, which contain the largest amount of Borrower's Inventory (in terms of estimated Value).

Dilution Reserve: a reserve established from time to time by Lender in an amount less than or equal to the amount of Borrower's bad debt write-downs, discounts, returns, promotions, credits, credit memos and other cash reductions with respect to Accounts. To the extent Borrower's dilutive items with respect to Accounts exceeds 5% of the gross face amount of such Accounts, Bank will establish a Reserve equal to the product of (x) the aggregate amount of Eligible Accounts multiplied by (y) the difference between (i) the actual dilution percentage and (ii) 5%.

Dominion Account: a special account established by Borrower at Lender over which Lender has exclusive control for withdrawal purposes.

EBITDA: determined on a consolidated basis for Borrower and its Subsidiaries, net income, calculated before interest expense, provision for income taxes, depreciation and amortization expense, gains or losses arising from the sale of capital assets, gains arising from the write-up of assets, and any extraordinary gains and extraordinary losses (in each case, to the extent included in determining net income).

Eligible Account: an Account owing to Borrower that arises in the ordinary course of business from its sale of goods or rendition of services, and is deemed by Lender, in its discretion, to be an Eligible Account. Without limiting the foregoing, no Account shall be an Eligible Account if (a) it is unpaid for more than 60 days after the original due date, or more than 90 days after the original invoice date; (b) 50% or more of the Accounts owing by the Account Debtor (or its Affiliates) are not Eligible Accounts under the foregoing clause; (c) when aggregated with other Accounts owing by the Account Debtor (or its Affiliates), it exceeds 15% of the aggregate Eligible Accounts (or such higher percentage as Lender may establish for the Account Debtor from time to time); (d) it does not conform with a covenant or representation herein; (e) it is owing by a creditor or supplier, or is otherwise subject to a potential offset, counterclaim, dispute, deduction, discount, recoupment, reserve, defense, chargeback, credit or allowance (but ineligibility shall be limited to the amount thereof); (f) an insolvency or bankruptcy proceeding has been commenced by or against the Account Debtor; or the Account Debtor has failed, has suspended or ceased doing business, is liquidating, dissolving or winding up its affairs, is not solvent or is subject to any Sanction; or Borrower is not able to bring suit or enforce remedies against the Account Debtor through judicial process; (g) the Account Debtor is organized or has its principal offices or assets outside the United States, unless the Account is supported by a letter of credit or credit insurance satisfactory to Lender; (h) it is owing by a governmental authority, unless the Account Debtor is the United States or any department, agency or instrumentality thereof and the Account has been assigned to Lender in compliance with the federal Assignment of Claims Act; (i) it is not subject to a duly perfected, first priority Lien in favor of Lender, or is subject to any other Lien; (j) the goods giving rise to it have not been delivered to the Account Debtor, the services giving rise to it have not been accepted by the Account Debtor, or it otherwise does not represent a final sale; (k) it is evidenced by Chattel Paper or an Instrument of any kind, or has been reduced to judgment; (l) its payment has been extended or the Account Debtor has made a partial payment; (m) it arises from a sale or services to an Affiliate, from a sale on a cash-on-delivery, bill-and-hold, sale-or-return, sale-on-approval, consignment, or other repurchase or return basis, or from a sale for personal, family or household purposes; (n) it represents a progress billing or retainage, or relates to services for which a performance, surety or completion bond or similar assurance has been issued; or (o) it includes a billing for interest, fees or late charges, but ineligibility shall be limited to the extent thereof. In calculating delinquent portions of Accounts under clauses (a) and (b), credit balances more than 90 days old will be excluded.

Eligible Credit Insured Accounts: an Account that meets the requirements of Eligible Accounts and is also credit insured, provided, that, with respect to such credit insurance, the insurance carrier, amount and terms of such insurance shall be acceptable to Lender and shall name Lender as beneficiary or loss

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

payee, as applicable.

Eligible Inventory: Inventory owned by Borrower that Lender, in its discretion, deems to be Eligible Inventory. Without limiting the foregoing, no Inventory shall be Eligible Inventory unless it (a) is finished goods and not raw materials, work-in-process, packaging or shipping materials, labels, samples, display items, bags, replacement parts or manufacturing supplies; (b) is not held on consignment, nor subject to any deposit or down payment; (c) is in new and saleable condition and not damaged, defective, shopworn or otherwise unfit for sale; (d) is not slow-moving, perishable, obsolete or unmerchantable, and does not constitute returned or repossessed goods; (e) meets all standards imposed by any governmental authority, has not been acquired from an entity subject to a Sanction and does not constitute hazardous materials under any environmental law; (f) conforms with the covenants and representations herein; (g) is subject to Lender's duly perfected, first priority Lien and no other Lien; (h) is within the continental United States, is not in transit except between locations of Borrower and is not consigned; (i) is not subject to any warehouse receipt or negotiable Document; (j) is not subject to any license or other arrangement that restricts Borrower's or Lender's right to dispose of such Inventory, unless Lender has received an appropriate Lien Waiver; and (k) is located (i) on premises containing Eligible Inventory totaling more than $50,000 aggregate Value, (ii) on leased premises or in possession of a warehouseman, processor, repairman, mechanic, shipper, freight forwarder or other Person, only if such lessor or other Person has delivered a Lien Waiver or an appropriate Reserve has been established, or (iii) on premises owned by Borrower subject to a mortgage, only if the mortgagee has delivered a mortgagee waiver satisfactory to Lender; and (l) is shown on a perpetual inventory report satisfactory to Lender.

Enforcement Action: any action to enforce any Obligations or Loan Documents or to realize on any Collateral.

Equity Interest: the interest of any (a) shareholder in a corporation; (b) partner in a partnership (whether general, limited, limited liability or joint venture); (c) member in a limited liability company; or (d) other Person having any other form of equity security or ownership interest.

Excluded Swap Obligation: with respect to an Obligor, each Swap Obligation as to which, and only to the extent that, such Obligor's guaranty or grant of a Lien as security therefor is or becomes illegal under the Commodity Exchange Act (7 U.S.C. §1 *et seq.*) because the Obligor does not constitute an "eligible contract participant" under the act (determined after giving effect to any keepwell, support or other agreement or guaranty benefiting such Obligor) when such guaranty or grant of Lien becomes effective with respect to the Swap Obligation. If a Swap governs more than one Swap Obligation, only the Swap Obligation(s) or portions thereof described above shall be Excluded Swap Obligation(s) of such Obligor.

Federal Funds Rate: for any day, the per annum rate calculated by the Federal Reserve Bank of New York ("FRBNY") based on such day's federal funds transactions by depository institutions (as determined in such manner as FRBNY shall set forth on its public website from time to time) and published on the next Business Day by FRBNY as the federal funds effective rate; provided, that in no event shall the Federal Funds Rate be less than zero.

Fiscal Quarter: each period of three months, commencing on the first day of a Fiscal Year.

Fiscal Year: Borrower's and Subsidiaries' fiscal year for accounting and tax purposes, ending on December 31 of each year.

Fixed Charge Coverage Ratio: the ratio, determined for Borrower and Subsidiaries on a consolidated basis for the most recent 12 month period then ended, of (a) EBITDA minus (i) capital expenditures (except those financed with Borrowed Money other than Loans) and (ii) cash taxes paid or Tax Distributions (as applicable), to (b) Fixed Charges.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Fixed Charges: for any period of determination for Borrower and Subsidiaries on a consolidated basis, the sum of (a) interest expense (other than payment-in-kind), plus (b) scheduled principal payments made on Borrowed Money, plus (c) Restricted Payments made in cash during such period.

Flood Insurance Laws: the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973, and all related laws and regulations.

Increased Reporting Trigger Period: the period (a) commencing on the day that (i) a Default or Event of Default occurs, or (ii) Availability is less than 20% of the Maximum Amount; and (b) continuing until, during each of the preceding 60 consecutive days, (i) no Default or Event of Default has existed and (ii) Availability has been more than 20% of the Maximum Amount.

Indemnitees: Secured Parties and their officers, directors, employees, Affiliates, attorneys, accountants, appraisers, auditors, advisors, consultants, agents, service providers, business valuation experts, consultants, and other professionals, experts and representatives.

Inventory: as defined in the UCC, including all goods intended for sale, lease, display or demonstration; work in process; raw materials; and other materials and supplies of any kind that are or could be used in connection with the manufacture, printing, packing, shipping, advertising, sale, lease or furnishing of such goods, or otherwise used or consumed in Borrower's business (but excluding Equipment).

Inventory Formula Amount: means:

(a) Prior to the Stepdown Date, the sum of:

   (i) the lesser of (A) 70% of the Value of Eligible Inventory consisting of hot rolled Inventory, and (B) 85% of the NOLV of Eligible Inventory consisting of hot rolled Inventory, as determined from the Sector3 Inventory Analysis; plus

   (ii) the lesser of (A) 70% of the Value of Eligible Inventory consisting of cold rolled Inventory, and (B) 85% of the NOLV of Eligible Inventory consisting of cold rolled Inventory, as determined from the Sector3 Inventory Analysis; plus

   (iii) the lesser of (A) 70% of the Value of Eligible Inventory consisting of coated Inventory, and (B) 85% of the NOLV of Eligible Inventory consisting of coated Inventory, as determined from the Sector3 Inventory Analysis; plus

   (iv) the lesser of (A) 70% of the Value of Eligible Inventory consisting of scrap Inventory, and (B) 85% of the NOLV of Eligible Inventory consisting of scrap Inventory, as determined from the Sector3 Inventory Analysis.

(b) After the Stepdown Date, the sum of:

   (i) the lesser of (A) 70% of the Value of Eligible Inventory consisting of hot rolled Inventory, and (B) 85% of the NOLV of Eligible Inventory consisting of hot rolled Inventory; plus

   (ii) the lesser of (A) 70% of the Value of Eligible Inventory consisting of cold rolled Inventory, and (B) 85% of the NOLV of Eligible Inventory consisting of cold rolled Inventory; plus

   (iii) the lesser of (A) 70% of the Value of Eligible Inventory consisting of coated Inventory, and (B) 85% of the NOLV of Eligible Inventory consisting of coated Inventory; plus

   (iv) the lesser of (A) 70% of the Value of Eligible Inventory consisting of scrap Inventory, and (B)

-6-

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

85% of the NOLV of Eligible Inventory consisting of scrap Inventory.

Lien: an interest in Property securing an obligation or claim, including a lien, security interest, pledge, hypothecation, assignment, trust, reservation, assessment right, encroachment, easement, right-of-way, covenant, condition, restriction, lease, or other title exception or encumbrance.

Lien Waiver: an agreement, in form and substance satisfactory to Lender, by which (a) for any material Collateral located on leased premises, the lessor waives or subordinates any Lien it may have on the Collateral, and allows Lender to enter the premises and remove, store and dispose of Collateral; (b) for any Collateral held by a warehouseman, processor, shipper, customs broker or freight forwarder, such Person waives or subordinates any Lien it may have on the Collateral, agrees to hold any Documents in its possession relating to the Collateral as agent for Lender and agrees to deliver Collateral to Lender upon request; (c) for any Collateral held by a repairman, mechanic or bailee, such Person acknowledges Lender's Lien, waives or subordinates any Lien it may have on the Collateral, and agrees to deliver Collateral to Lender upon request; and (d) for any Collateral subject to a licensor's intellectual property rights, the licensor grants to Lender the right, vis-à-vis such licensor, to enforce Lender's Liens with respect to the Collateral, including the right to dispose of it with the benefit of the intellectual property, whether or not a default exists under any applicable license.

Loan: any loan made by Lender under the credit facility established by this Agreement.

Loan Documents: this Agreement, Other Agreements and Security Documents.

Loan Year: each 12 month period commencing on the Closing Date (as defined in **Section 6.1**) and each anniversary of the Closing Date.

Material Adverse Effect: the effect of any event or circumstance that, taken alone or in conjunction with other events or circumstances, (a) has or could be reasonably expected to have a material adverse effect on the business, operations, Properties, prospects or condition (financial or otherwise) of any Obligor, the value of any material Collateral, the enforceability of any Loan Documents, or the validity or priority of Lender's Liens on any Collateral; (b) impairs the ability of an Obligor to perform its obligations under the Loan Documents, including repayment of any Obligations; or (c) otherwise impairs the ability of Lender to enforce or collect any Obligations or to realize upon any Collateral.

Maximum Amount: means $30,000,000.

Modification: any amendment, supplement, extension, approval, consent, waiver, change or other modification of a Loan Document, including any waiver of a Default or Event of Default.

NOLV: the net orderly liquidation value of Inventory, determined on the basis of the lower of cost or market value, expressed as a percentage, expected to be realized at an orderly, negotiated sale held within a reasonable period of time, net of all liquidation and/or foreclosure expenses, as determined from the most recent appraisal of Borrower's Inventory (or, when used in clause (a) of the definition of Inventory Formula Amount, as determined from the Sector3 Inventory Analysis), performed by an appraiser and on terms satisfactory to Lender.

Notice of Borrowing: a Loan request by Borrower, in form satisfactory to Lender.

Obligations: all (a) principal of and premium, if any, on the Loans, (b) interest, expenses, fees, indemnification obligations, Claims and other amounts payable by Obligors under Loan Documents, (c) Bank Product Debt, and (d) other debts, obligations and liabilities of any kind owing by any Obligor to Lender, whether now existing or hereafter arising, whether evidenced by a note or other writing, whether

-7-

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

allowed in an insolvency or bankruptcy proceeding, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, or joint or several; <u>provided</u>, that Obligations of an Obligor shall not include its Excluded Swap Obligations.

<u>Obligor</u>: Borrower or any other Person that guarantees payment of or grants security for any Obligations.

<u>Other Agreement</u>: each Lien Waiver, Communication, or other document, instrument or agreement (other than this Agreement or a Security Document) delivered by an Obligor or other Person to Lender in connection with this credit facility.

<u>Patriot Act</u>: the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001).

<u>Payment Item</u>: each check, draft or other item of payment payable to Borrower, including those constituting proceeds of any Collateral.

<u>Permitted Holders</u>: means (a) Dan Butler and Lisa Butler, (b) any Affiliate controlled by any such Person, and (c) any trust or partnership created solely for the benefit of any such Person and/or members of the family of any such Person, in each case, pursuant to an estate vehicle of such Person.

<u>Permitted Lien</u>: as defined in **Section 10.2.2**.

<u>Person</u>: any individual, corporation, limited liability company, partnership, joint venture, association, trust, unincorporated organization, governmental authority or other entity of any kind.

<u>Post-Closing Inventory Appraisal</u>: means an appraisal of Borrower's inventory that shall be completed within the first six months after the Closing Date and shall be performed by an appraiser and on terms satisfactory to Lender.

<u>Prime Rate</u>: the rate of interest announced by Lender from time to time as its prime rate. Such rate is set by Lender on the basis of various factors, including its costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above or below such rate. Any change in such rate publicly announced by Lender shall take effect at the opening of business on the day specified in the announcement.

<u>Property</u>: any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible.

<u>Real Estate</u>: all right, title and interest (whether as owner, lessor or lessee) in any real Property or any buildings, structures, parking areas or other improvements thereon.

<u>Rent and Charges Reserve</u>: a reserve for three months' rent and other charges (plus, if applicable, any past due amounts) owing to a landlord, warehouseman, processor, repairman, mechanic, shipper, freight forwarder, broker or other Person who possesses or could assert a Lien on any Collateral, unless it has executed a Lien Waiver (but subject to the proviso in clause (iii) of the definition of Borrowing Base).

<u>Reserves</u>: collectively, each (a) Bank Product Reserve; (b) Rent and Charges Reserve; (c) Dilution Reserve, (d) reserve for accrued royalties and licensing fees owing by Borrower, whether or not then due and payable; and (e) other reserve against the Collateral, Borrowing Base or other matters as Lender may establish from time to time in its discretion.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

<u>Restricted Payments</u>: collectively, (a) distributions or dividends made in respect of the Equity Interest or other ownership interests of Borrower permitted under Section 10.2.4(c), (b) acquisitions and investments permitted under Section 10.2.5(d) with Lender's consent, and (c) payments with respect to Subordinated Debt and prepayments of Borrowed Money, to the extent such payments are permitted under Section 10.2.8.

<u>Restricted Payment Conditions</u>: prior to and after giving pro forma effect to a Restricted Payment, (a) no Default or Event of Default exists or is caused thereby; (b) Average Daily Availability is at least 40% of the Maximum Amount for the 60 day period immediately preceding such payment; (c) Availability is at least 40% of the Maximum Amount immediately after giving effect to such payment; (d) the Fixed Charge Coverage Ratio for the twelve month period preceding the month in which the proposed payment is to be made, is not less than 1.1 to 1.0; and (e) Lender shall have received a certificate of the President or Chief Financial Officer of Borrower certifying as to compliance with the preceding clauses and demonstrating (in reasonable detail) the calculations required thereby.

<u>Restrictive Agreement</u>: an agreement (other than a Loan Document) that conditions or restricts the right of Borrower, any Subsidiary or any Obligor to incur or repay Borrowed Money, to grant Liens on any assets, to declare or make Distributions, to modify, extend or renew any agreement evidencing Borrowed Money, or to repay any intercompany Debt.

<u>Revolver Usage</u>: the aggregate amount of outstanding Loans.

<u>Sanction</u>: any sanction administered or enforced by the U.S. government, United Nations Security Council, European Union, U.K. government or other applicable sanctions authority, including any sanction or specially designated nationals list restriction administered by the U.S. Treasury Department's Office of Financial Assets Control ("<u>OFAC</u>").

<u>Sector3 Inventory Analysis</u>: means the inventory analysis prepared by Sector3 as of July 28, 2022.

<u>Secured Parties</u>: Lender and all providers of Bank Products.

<u>Security Documents</u>: all guarantees, mortgages, Deposit Account Control Agreements and other documents, instruments and agreements now or hereafter securing (or intended to secure) any Obligations.

<u>Stepdown Date</u>: (a) when used in the definition of Accounts Formula Amount, April 1, 2023, and (b) when used in the definition of Inventory Formula Amount, the earlier of (i) April 1, 2023, and (ii) the first day of the month following the Post-Closing Inventory Appraisal.

<u>Subordinated Debt</u>: debt incurred by Borrower that is expressly subordinate and junior in right of payment to the indefeasible full payment of all Obligations, and is on terms (including maturity, interest, fees, repayment, covenants, security and subordination) satisfactory to Lender.

<u>Subordination Agreement</u>: any subordination or intercreditor agreement entered into by Lender and the holders of any Subordinated Debt.

<u>Subsidiary</u>: any entity at least 50% of whose voting securities or Equity Interests is owned by Borrower (including indirect ownership through other entities in which Borrower directly or indirectly owns 50% of the voting securities or Equity Interests).

<u>Swap</u>: as defined in §1a(47) of the Commodity Exchange Act.

<u>Tax Distributions</u>: a distribution by Borrower to holders of its Equity Interests solely to the extent necessary to permit such holders to discharge their actual current federal, state and local tax liabilities arising directly as holders of such Equity Interests.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Taxes: taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including interest, additions to tax or penalties applicable thereto.

Termination Date: the earliest to occur of (a) November 9, 2025; (b) the date on which Borrower terminates the Commitment pursuant to **Section 2.1.3**; or (c) the date on which the Commitment is terminated pursuant to **Section 11.2**.

UCC: the Uniform Commercial Code as in effect in the State of New York or, when used in reference to a Lien for which the laws of another jurisdiction govern perfection or enforcement, the Uniform Commercial Code of such other jurisdiction.

Unused Line Fee Rate: a per annum rate equal to 0.25%.

Value: with respect to Inventory, its value determined on the basis of the lower of cost or market value, calculated on a first-in, first-out basis, and excluding any portion of cost attributable to intercompany profit among Borrower and its Affiliates.

    **1.2.**   **Terms**. Under the Loan Documents (except as otherwise specified therein), all accounting terms shall be interpreted, all accounting determinations shall be made, and all financial statements shall be prepared, in accordance with generally accepted accounting principles in the U.S. ("GAAP") applied on a basis consistent with the most recent reviewed financial statements of Borrower delivered to Lender before the Closing Date and using the same inventory valuation method and lease conventions as used in such financial statements, except for any change required or permitted by GAAP if Borrower's certified public accountants concur in such change, the change is disclosed to Lender, and all relevant provisions of the Loan Documents are Modified in a manner satisfactory to Lender to take into account the effects of the change. Reference to any (a) law includes all related regulations, interpretations, supplements, amendments and successor provisions; (b) document includes any Modification thereof (if permitted hereunder); (c) time of day means the time at Lender's notice address; and (d) discretion or satisfaction of Lender means its sole and absolute discretion exercised from time to time.

    **1.3.**   **Uniform Commercial Code**. As used herein, the following terms are defined in accordance with the UCC: "Chattel Paper," "Commercial Tort Claim," "Deposit Account," "Document," "Equipment," "General Intangibles," "Goods," "Instrument," "Investment Property," "Letter-of-Credit Right" and "Supporting Obligation."

## SECTION 2.   CREDIT FACILITIES

    **2.1.**   **Commitment**.

        **2.1.1.**   **Loans**. Lender agrees, on the terms set forth herein, to make Loans to Borrower in an aggregate amount up to the Maximum Amount, from time to time through the Termination Date. Loans may be repaid and reborrowed as provided herein. Lender has no obligation to honor a request for a Loan if Revolver Usage at such time plus the requested Loan would exceed the Borrowing Base. Lender may fulfill its obligations under the Loan Documents through any of its offices (including a domestic or foreign Affiliate or branch), in its discretion, which shall not affect any Obligations or requirements of Obligors under the Loan Documents.

        **2.1.2.**   **Use of Proceeds**. The proceeds of Loans shall be used by Borrower solely (a) to satisfy existing debt or credit facilities; (b) to pay fees and transaction expenses associated with the closing of this credit facility; (c) to pay Obligations in accordance with this Agreement; and (d) for other lawful corporate purposes, including working capital. Borrower shall not, directly or indirectly, use any Loan, nor use, lend, contribute or otherwise make available any Loan proceeds to any Subsidiary, joint venture partner or other Person, (i) to purchase or carry, or to reduce or refinance any debt incurred to purchase or carry, margin stock as governed by Regulation U of the Federal Reserve Board of Governors; (ii) to fund any

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

activities of or business with any Person, or in any country or territory, that is the target of any Sanction; or (iii) in any manner that would result in a violation of a Sanction, anti-corruption law or other applicable law by any Person (including any Secured Party or other individual or entity participating in any transaction).

**2.1.3.** <u>Voluntary Reduction or Termination of Commitment</u>. The Commitment shall terminate on the Termination Date, unless sooner terminated in accordance herewith. Upon at least 30 days prior written notice to Lender, Borrower may terminate the Commitment and this credit facility. On the Termination Date, Borrower shall make full payment of all Obligations.

**2.1.4.** <u>Overadvances</u>. If Revolver Usage exceeds the Borrowing Base ("<u>Overadvance</u>") at any time, such excess shall be payable by Borrower **on demand** by Lender, but all Revolver Usage (including the excess amount) shall nevertheless constitute Obligations secured by the Collateral and entitled to all benefits of the Loan Documents. No funding or sufferance of an Overadvance by Lender shall constitute a waiver of the Event of Default caused thereby.

**2.2.** **[Reserved]**.

**SECTION 3. INTEREST, FEES AND CHARGES**

**3.1.** <u>**Interest.**</u>

**3.1.1.** <u>Rate of Interest</u>. The Obligations shall bear interest at the BSBY Rate as in effect from time to time, plus the Applicable Margin. During any Event of Default, Obligations shall bear interest at the Default Rate (whether before or after any judgment). Borrower acknowledges that the cost and expense to Lender due to an Event of Default are difficult to ascertain and the Default Rate is fair and reasonable compensation for this.

**3.1.2.** <u>Payment of Interest</u>. Interest shall accrue from the date a Loan is advanced or Obligation is incurred or payable, as applicable, until paid in full and shall, in no event be less than zero. Interest accrued on the Loans is due and payable in arrears, (i) on the first day of each month; (ii) concurrently with prepayment of any Loan, with respect to the principal amount being prepaid; and (iii) on the Termination Date. Interest accrued on any other Obligations shall be due and payable as provided in the related agreements or, if no payment date is specified, **on demand**.

**3.2.** <u>**Fees.**</u>

**3.2.1.** <u>Unused Line Fee</u>. Borrower shall pay to Lender a fee equal to the Unused Line Fee Rate times the amount by which the Maximum Amount exceeds the average daily Revolver Usage during any month. Such fee shall be payable in arrears, on the first day of each month and on the Termination Date.

**3.2.2.** <u>Reserved</u>.

**3.2.3.** <u>Closing Fee</u>. On the Closing Date, Borrower shall pay to Lender a closing fee of $40,000.

**3.2.4.** <u>Reserved</u>.

**3.3.** <u>**Computation of Interest, Fees, Yield Protection.**</u> All interest for BSBY Loans, as well as fees and other charges calculated on a per annum basis, shall be computed for actual days elapsed, based on a year of 360 days; <u>provided</u>, that interest for Base Rate Loans (unless determined by reference to the BSBY Rate) shall be based on a year of 365/6 days, as applicable. Each determination by Lender of any interest, fees, interest rate or amounts payable hereunder shall be final, conclusive and binding for all purposes, absent manifest error. All fees payable under **Section 3.2** are compensation for services, are fully earned when due and not subject to

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

rebate or proration, and are not interest or any other charge for the use, forbearance or detention of money. A statement submitted to Borrower of amounts payable under **Section 3.4** or **3.6** shall be final, conclusive and binding for all purposes, absent manifest error, and Borrower shall pay such amounts to Lender within 10 days following receipt of the statement.

**3.4.** **Reimbursement Obligations.** Borrower shall pay all fees, costs, expenses or advances Lender may incur during an Event of Default promptly upon request. Borrower shall reimburse Lender for all legal, accounting, appraisal, consulting, and other fees and expenses incurred in connection with (a) negotiation and preparation of Loan Documents, including any Modification thereof; (b) administration of and actions relating to any Collateral, Loan Documents and transactions contemplated thereby, including any actions taken to perfect or maintain priority of Lender's Liens on any Collateral, to maintain any insurance required hereunder or to verify Collateral; and (c) each examination or appraisal with respect to Borrower or any Collateral, whether by Lender's personnel or a third party. All legal, accounting and consulting fees shall be charged to Borrower by Lender's professionals at their full hourly rates, regardless of any alternative fee arrangements that Lender or any of its Affiliates may have with such professionals that otherwise might apply to this or any other transaction. If, for any reason (including inaccurate information in Borrower Materials), it is determined that a higher interest rate should have applied to a period than was actually applied, then the proper interest shall be applied retroactively and Borrower shall immediately pay to Lender an amount equal to the difference between the amount of interest and fees that would have accrued using the proper interest rate and the amount actually paid. All amounts payable by Borrower under this Section are due **on demand**.

**3.5.** **Illegality; Interest Rate Not Ascertainable.** If Lender determines that a law has made it unlawful or a governmental authority has asserted it is unlawful for Lender to make or maintain Loans or to determine or charge interest rates based on any interest rate convention hereunder, that adequate and fair means do not exist for ascertaining any interest rate or an interest rate cannot otherwise be determined at such time, or that a governmental authority has imposed material restrictions on Lender's authority to use, purchase, sell, hedge, take deposits of or otherwise match fund any interest rate, then, on notice by Lender to Borrower, any obligation of Lender to make or continue Loans based on such interest rate shall be suspended until Lender notifies Borrower that such circumstances no longer exist. If such circumstances do not apply to Base Rate Loans and Lender has not yet specified a replacement interest rate and adjustment as provided in the definition of BSBY Rate (if applicable), Borrower may convert any pending request for an affected Loan to a request for a Base Rate Loan and any outstanding affected Loan shall convert to a Base Rate Loan at the end of the current calendar month, or immediately, if Lender cannot so maintain the Loan; provided, that, if a Loan is converted to a Base Rate Loan because the Lender cannot use, or ascertain, the BSBY Rate, then, in each case, the Base Rate shall be determined by Lender without reference to the BSBY Rate component of the Base Rate.

**3.6.** **Increased Costs; Capital Adequacy.**

**3.6.1.** Increased Costs Generally. If any Change in Law shall:

(a)     impose, modify or deem applicable any reserve, liquidity, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, Lender;

(b)     subject Lender to any taxes with respect to any Loan, Commitment or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(c)     impose on Lender or any interbank market any other condition, cost or expense affecting any Loan, Commitment or Loan Document;

and the result thereof shall be to increase the cost to Lender of making or maintaining any Loan or Commitment, or converting to or continuing any interest option for a Loan, or to reduce the amount of any sum received or receivable by Lender hereunder (whether of principal, interest or any other amount) then,

7038325.8
23-46098-mlo     Doc 59-1     Filed 08/01/23     Entered 08/01/23 12:28:37     Page 32 of 87

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

upon request by Lender, Borrower will pay to Lender such additional amount(s) as will compensate it for the additional costs incurred or reduction suffered.

**3.6.2.** <u>Capital Requirements</u>. If Lender determines that a Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on Lender's or its holding company's capital as a consequence of this Agreement, Commitment or Loans to a level below that which Lender or its holding company could have achieved but for such Change in Law (taking into consideration its policies with respect to capital adequacy), then from time to time Borrower will pay to Lender such additional amounts as will compensate it or its holding company for the reduction suffered. "Change in Law" means the occurrence, after the date hereof, of (a) the adoption or effectiveness of, or any change in, any law, rule, regulation or treaty, or (b) the making, issuance or application of any request, guideline, requirement or directive (whether or not having the force of law) by any governmental authority; <u>provided</u>, that such term includes all requests, rules, guidelines, requirements or directives (i) under or relating to the Dodd-Frank Wall Street Reform and Consumer Protection Act, or (ii) promulgated pursuant to Basel III by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any similar authority), regardless in each case of the date enacted, adopted or issued.

**3.7.** **<u>Funding Losses</u>**. If for any reason (a) any borrowing of a Loan does not occur on the date specified therefor in a Notice of Borrowing (whether or not withdrawn), or (b) Borrower fails to repay a Loan when required, then it shall pay to Lender all losses, expenses and fees arising from redeployment of funds or termination of match funding with respect to such Loan.

**3.8.** **<u>Maximum Interest</u>**. Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law ("<u>maximum rate</u>"). If Lender shall receive interest in an amount that exceeds the maximum rate, the excess interest shall be applied to the principal of the Obligations or, if it exceeds such unpaid principal, refunded to Borrower. In determining whether the interest contracted for, charged or received by Lender exceeds the maximum rate, Lender may (a) characterize any payment that is not principal as an expense, fee or premium rather than interest; (b) exclude voluntary prepayments and the effects thereof; and (c) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**SECTION 4.   LOAN ADMINISTRATION**

**4.1.   <u>Manner of Borrowing and Funding Loans</u>.**

**4.1.1.** <u>Notice of Borrowing.</u>

(a)     To request a Loan, Borrower shall deliver a Notice of Borrowing to Lender by 11:00 a.m. at least three Business Days prior to the requested funding date. Notices received after such time shall be deemed received on the next Business Day. Each Notice of Borrowing shall be irrevocable and must specify the Loan amount and requested funding date (which must be a Business Day).

(b)     Unless payment is otherwise made by Borrower, the becoming due of any Obligation (whether principal, interest, fees, costs, expenses or other charges, including Cash Collateral and Bank Product Debt) shall be deemed to be a request for a Loan on the due date in the amount due and the Loan proceeds shall be disbursed as direct payment of such Obligation. In addition, Lender may, at its option, charge such amount against any operating, investment or other account of Borrower maintained with Lender or any of its Affiliates.

(c)     If Borrower maintains a disbursement account with Lender or any of its Affiliates, then presentation for payment in the account of a Payment Item when there are insufficient funds to cover it shall be deemed to be a request for a Loan on the presentation date, in the amount of the Payment Item.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Proceeds of the Loan may be disbursed directly to the account.

      **4.1.2.**  <u>Notices</u>. If Borrower requests a Loan based on telephonic or electronic instructions to Lender, Borrower shall confirm the request by prompt delivery of a Notice of Borrowing. Lender is not liable for any loss suffered by Borrower as a result of Lender acting on its understanding of telephonic or electronic instructions from a person believed in good faith to be authorized to give instructions on Borrower's behalf.

      **4.2.**  **Effect of Termination.** On the Termination Date, the Obligations shall be immediately due and payable, and each Secured Party may terminate its Bank Products. Until full payment of the Obligations, all undertakings of Borrower contained in the Loan Documents shall continue, and Lender shall retain its Liens in the Collateral and all of its rights and remedies under the Loan Documents. Lender shall not be required to terminate its Liens unless it receives Cash Collateral or a written agreement, in each case satisfactory to it, protecting it from dishonor or return of any Payment Item previously applied to the Obligations as well as any reasonably foreseeable Claims. **Sections 3.4**, **3.6**, **5.5**, **12.2**, this Section, and each indemnity or waiver given by an Obligor in any Loan Document shall survive full payment of the Obligations.

## SECTION 5.  PAYMENTS

      **5.1.**  **General Payment Provisions.** All payments of Obligations shall be made without offset, counterclaim or defense of any kind, free and clear of (and without deduction for) any taxes or other amounts, and in immediately available funds, not later than 12:00 noon on the due date. Any payment after such time shall be deemed made on the next Business Day. Borrower agrees that Lender shall have the continuing, exclusive right to apply and reapply payments and proceeds of Collateral against Obligations, in such manner as Lender deems advisable. Loans may be prepaid from time to time, and notice of prepayment shall be provided to Lender at least two Business Days in advance; <u>provided</u>, that no notice is required for payments pursuant to **Section 5.5**.

      **5.2.**  **Repayment of Loans.** Loans shall be due and payable in full on the Termination Date, unless payment is sooner required hereunder. If an Overadvance exists at any time, Borrower shall, on the sooner of Lender's demand or the first Business Day after Borrower has knowledge thereof, repay Loans in an amount sufficient to reduce Revolver Usage to the Borrowing Base.

      **5.3.**  **Payment of Other Obligations.** Obligations other than Loans, including fees, costs and expenses, shall be paid by Borrower **on demand**.

      **5.4.**  **Marshaling; Payments Set Aside.** Lender shall have no obligation to marshal any assets in favor of any Obligor or against any Obligations. If any payment by or on behalf of an Obligor is made to Lender or if Lender exercises a right of setoff, and any of such payment or setoff is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by Lender in its discretion) to be repaid to a trustee, receiver or any other Person, then the Obligation originally intended to be satisfied, and all Liens, rights and remedies relating thereto, shall be revived and continued in full force and effect as if such payment or setoff had not occurred.

      **5.5.**  **Dominion Account**. The ledger balance in the main Dominion Account as of the end of a Business Day shall be applied to the Obligations at the beginning of the next Business Day. Any resulting credit balance shall not accrue interest in favor of Borrower and shall be made available to Borrower as long as no Default or Event of Default exists.

      **5.6.**  **Taxes**

      **5.6.1.**  <u>Payments Free of Taxes; Obligation to Withhold; Tax Payment</u>.

      (a)    All payments of Obligations by Obligors shall be made without deduction or withholding for any Taxes, except as required by applicable law. If applicable law (as determined by

-14-

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Lender in its discretion) requires the deduction or withholding of any Tax with respect to any such payment, then such recipient shall be entitled to make or require such deduction or withholding based on information and documentation provided pursuant to this Section.

(b)     If a recipient or Obligor is required by the Internal Revenue Code ("Code") or any other applicable law to withhold or deduct Taxes (other than Excluded Taxes), including backup withholding and withholding taxes, from any payment with respect to Obligations, then the recipient or Obligor, to the extent required by applicable law, shall timely pay the full amount to be withheld or deducted to the relevant Governmental Authority. In each case, the sum payable by the applicable Obligor shall be increased as necessary so the recipient receives the sum it would have received had no such withholding or deduction been made. As used in this Section, "Excluded Taxes" are Taxes imposed on a recipient's net income as a result of the recipient being organized under, or having its principal or lending office located in, the jurisdiction imposing such Tax.

(c)     Without limiting the foregoing, Borrower shall timely pay all stamp, court, documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a Lien under, or otherwise with respect to, any Loan Document, in each case to the relevant Governmental Authority in accordance with applicable law or, at Lender's option, reimburse Lender therefor.

**5.6.2.** <u>Tax Indemnification</u>. Borrower shall indemnify and hold harmless each recipient against any Taxes (including those imposed or asserted on or attributable to amounts payable under this Section, but excluding Excluded Taxes) payable or paid by a recipient or required to be withheld or deducted from a payment with respect to any Obligations, as well as any penalties, interest and reasonable expenses relating thereto, whether or not such Taxes were correctly or legally imposed by the Governmental Authority. Borrower shall make payment within 10 days after demand for any amount payable under this Section. A certificate delivered to Borrower by Lender (for itself or on behalf of a different recipient), as to the amount of such payment or liability, shall be conclusive, absent manifest error.

**5.6.3.** <u>Evidence of Payments</u>. As soon as practicable after payment by an Obligor of any Taxes pursuant to this Section, Borrower shall deliver to Lender the original or a certified copy of a receipt issued by the appropriate Governmental Authority evidencing the payment, a copy of any return required by applicable law to report the payment or other evidence of payment reasonably satisfactory to Lender.

**5.7.** **Account Stated**. Lender shall maintain, in accordance with its customary practices, loan account(s) evidencing Borrower's debt hereunder. Failure by Lender to record anything in a loan account, or any error in doing so, shall not limit or otherwise affect the obligation of Borrower to pay any amount owing hereunder. Entries made in a loan account shall constitute presumptive evidence of the information contained therein and shall be conclusive and binding on Borrower, absent manifest error.

## SECTION 6.    CONDITIONS PRECEDENT

**6.1.** **Conditions Precedent to Initial Loans.** In addition to the conditions set forth in **Section 6.2**, Lender shall not be required to fund any requested Loan or otherwise extend credit to Borrower hereunder, until the date ("Closing Date") that each of the following conditions has been satisfied:

(a)     Each Loan Document shall have been duly executed and delivered to Lender by each of the signatories thereto, and Borrower shall be in compliance with all terms thereof.

(b)     Lender shall have received acknowledgments of all filings or recordations necessary to perfect its Liens in the Collateral, as well as UCC and Lien searches and other evidence satisfactory to Lender that such Liens are the only Liens upon the Collateral, except Permitted Liens.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

(c)     Lender shall have received satisfactory Lien Waivers in respect of the Designated Locations where Borrower's Inventory is stored and/or warehoused by a third party.

(d)     Lender shall have received duly executed agreements establishing the Dominion Account and related lockbox in form and substance satisfactory to Lender.

(e)     Lender shall have received certificates, in form and substance satisfactory to it, from a knowledgeable senior officer of Borrower certifying that, after giving effect to the initial Loans and transactions hereunder, (i) Borrower is solvent; (ii) no Event of Default exists; (iii) the representations and warranties set forth in **Section 9** are true and correct; and (iv) Borrower has complied with all agreements and conditions to be satisfied by it under the Loan Documents.

(f)     Lender shall have received copies of Borrower's organizational documents and all resolutions authorizing the execution and delivery of the Loan Documents and any other resolutions adopted with respect to this credit facility.

(g)     Lender shall have received copies of the charter documents of Borrower, certified by the Secretary of State or other appropriate official of Borrower's jurisdiction of organization. Lender shall have received good standing certificates for Borrower, issued by the Secretary of State or other appropriate official of Borrower's jurisdiction of organization and each jurisdiction where Borrower's conduct of business or ownership of Property necessitates qualification, as well as any necessary third party or governmental consents and/or Lien Waivers.

(h)     Lender shall have received copies of policies or certificates of insurance and insurance endorsements for the insurance policies carried by Borrower, all in compliance with the Loan Documents.

(i)     Lender shall have completed its business, financial and legal due diligence of Borrower, including a roll-forward of its previous field examination, with results satisfactory to Lender. No material adverse change in the financial condition of Borrower or in the quality, quantity or value of any Collateral shall have occurred since December 31, 2021.

(j)     Borrower shall have paid all fees and expenses to be paid to Lender on the Closing Date.

(k)     Lender shall have received a Borrowing Base Report prepared as of September 30, 2022, showing Availability of at least $3,000,000 upon giving effect to the initial funding of Loans, and to the payment by Borrower of all fees and expenses incurred in connection herewith as well as any payables stretched beyond their customary payment practices.

(l)     Borrower shall have provided, in form and substance satisfactory to Lender, all documentation and other information as Lender deems appropriate in connection with applicable know-your-customer and anti-money-laundering laws, including the Patriot Act and Beneficial Ownership Regulation. At least five days prior to the Closing Date, any Obligor that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation shall deliver a Beneficial Ownership Certification to Lender in relation to such Obligor.

**6.2.     Conditions Precedent to All Credit Extensions**. Lender shall not be required to make any credit extension hereunder (including funding a Loan or granting any other accommodation to or for the benefit of Borrower), unless the following conditions are satisfied at such time:

(a)     No Default or Event of Default exists;

(b)     The representations and warranties of Borrower in the Loan Documents are true

-16-

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

and correct (except for representations and warranties that expressly apply only on an earlier date);

      (c)     All conditions precedent in each Loan Document are satisfied; and

      (d)     No event has occurred or circumstance exists that has or could reasonably be expected to have a Material Adverse Effect.

Each request (or deemed request) by Borrower for an extension of credit shall constitute a representation by Borrower that the foregoing conditions are satisfied on the date of such request and on the date of the credit extension. As an additional condition to a credit extension, Lender may request any other information, certification, document, instrument or agreement as it deems appropriate.

## SECTION 7.   COLLATERAL

    **7.1.**   **Grant of Security Interest.**  To secure the prompt payment and performance of its Obligations, Borrower hereby grants to Lender a continuing security interest in and Lien on all personal Property of Borrower, including the following, whether now owned or hereafter acquired, and wherever located:

      (a)     all Accounts;

      (b)     all Chattel Paper, including electronic chattel paper;

      (c)     all Commercial Tort Claims;

      (d)     all Deposit Accounts;

      (e)     all Documents;

      (f)     all General Intangibles, including intellectual property;

      (g)     all Goods, including Inventory, Equipment and fixtures;

      (h)     all Instruments;

      (i)     all Investment Property;

      (j)     all Letter-of-Credit Rights;

      (k)     all Supporting Obligations;

      (l)     all monies, whether or not in the possession or under the control of Lender, or a bailee or Affiliate of Lender, including any Cash Collateral;

      (m)     all accessions to, substitutions for, and replacements, products, and cash and non-cash proceeds of the foregoing, including proceeds of and unearned premiums with respect to insurance policies, and claims against any Person for loss, damage or destruction of any Collateral; and

      (n)     all books and records (including customer lists, files, correspondence, tapes, computer programs, print-outs and computer records) pertaining to the foregoing.

    **7.2.**   **Lien on Deposit Accounts; Cash Collateral.**

      **7.2.1.**   <u>Deposit Accounts</u>.  To further secure the prompt payment and performance of its Obligations, Borrower hereby grants to Lender a continuing security interest and Lien upon all amounts

7038325.8

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

credited to any Deposit Account of Borrower, including sums in any blocked, lockbox, sweep or collection account.

**7.2.2.** <u>Cash Collateral</u>. Cash Collateral may be invested, at Lender's discretion (and with the consent of Borrower, as long as no Event of Default exists), but Lender shall have no duty to do so, regardless of any agreement or course of dealing with Borrower, and Lender shall have no responsibility for any investment or loss. As security for its Obligations, Borrower hereby grants to Lender a security interest in and Lien on all Cash Collateral held from time to time and all proceeds thereof, whether held in a Cash Collateral Account or otherwise. Lender may apply Cash Collateral to the payment of Obligations as they become due, in such order as Lender may elect. Each Cash Collateral Account and all Cash Collateral shall be under the sole dominion and control of Lender, and neither Borrower or any other Person shall have any right to any Cash Collateral, until full payment of the Obligations.

**7.3.** <u>Reserved</u>.

**7.4.** <u>Other Collateral</u>.

**7.4.1.** <u>Commercial Tort Claims</u>. Borrower shall promptly notify Lender in writing if Borrower has a Commercial Tort Claim, and shall take such actions as Lender deems appropriate to subject such claim to a duly perfected, first priority Lien in favor of Lender.

**7.4.2.** <u>Certain After-Acquired Collateral</u>. Borrower shall promptly notify Lender in writing if, after the Closing Date, Borrower obtains any interest in any Collateral and shall promptly take such actions as Lender deems appropriate to effect Lender's duly perfected, first priority Lien upon such Collateral, including obtaining any appropriate possession, control agreement or Lien Waiver. If any Collateral is in the possession of a third party, at Lender's request, Borrower shall obtain an acknowledgment that such third party holds the Collateral for the benefit of Lender.

**7.5.** <u>Limitations</u>. The Lien on Collateral granted hereunder is given as security only and shall not subject Lender to, or in any way modify, any obligation or liability of Borrower relating to any Collateral. In no event shall an Obligor's grant of a Lien under any Loan Document secure its Excluded Swap Obligations.

**7.6.** <u>Further Assurances; Extent of Liens</u>. All Liens granted to Lender under the Loan Documents are for the benefit of Secured Parties. Promptly upon request, Borrower shall deliver such instruments and agreements, and shall take such actions, as Lender deems appropriate under applicable law to evidence or perfect its Lien on any Collateral, or otherwise to give effect to the intent of this Agreement. Borrower authorizes Lender to file any financing statement that describes the Collateral as "all assets" or "all personal property" of Borrower, or words to similar effect, and ratifies any action taken by Lender before the Closing Date to effect or perfect its Lien on any Collateral.

## SECTION 8. COLLATERAL ADMINISTRATION

**8.1.** <u>Borrowing Base Reports</u>. By the 15th day of each month, Borrower shall deliver to Lender a Borrowing Base Report as of the close of business of the previous month, and at such other times as Lender may request; provided, that, during an Increased Reporting Trigger Period, Borrower shall deliver to Lender a weekly Borrowing Base Report, together with a gross Accounts and Inventory report on or before the Tuesday of each week, reflecting Inventory and outstanding Accounts as of the end of the preceding week (without any change to ineligible Accounts or Inventory). All information (including calculation of Average Daily Availability) in a Borrowing Base Report shall be certified by Borrower and, with respect to Inventory, such reporting shall be broken down by category with a breakdown of the primary and secondary Inventory coils. Lender may from time to time adjust such report (a) to reflect Lender's reasonable estimate of declines in value of Collateral, due to collections received in the Dominion Account or otherwise; (b) to adjust advance rates to reflect changes in dilution, quality, mix and other factors affecting Collateral; and (c) to the extent any information or

-18-

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

calculation does not comply with this Agreement.

## 8.2. **Accounts.**

**8.2.1.** <u>Records and Schedules of Accounts</u>.  Borrower shall provide to Lender, on or before the 15th day of each month, (a) a detailed aged trial balance of all Accounts as of the end of the preceding month, specifying each Account's Account Debtor name and address, amount, invoice date and due date, showing any discount, allowance, credit, authorized return or dispute, and including such proof of delivery, copies of invoices and invoice registers, copies of related documents, repayment histories, status reports and other information as Lender may reasonably request; <u>provided,</u> that, during an Increased Reporting Trigger Period, with respect to Eligible Accounts, the foregoing information shall be delivered on a weekly basis by Tuesday of each week for the immediately preceding week; and (b) a monthly roll forward report of all Accounts from the previous month (or weekly roll forward report during an Increased Reporting Trigger Period).  If Accounts in an aggregate face amount of $50,000 or more cease to be Eligible Accounts, Borrower shall notify Lender of such occurrence promptly (and in any event within one (1) Business Day) after Borrower has knowledge thereof.

**8.2.2.** <u>Account Verification</u>.  Lender shall have the right at any time, in the name of Lender, any designee of Lender or Borrower, to verify the validity, amount or any other matter relating to any Accounts of Borrower by mail, telephone or otherwise.

**8.2.3.** <u>Maintenance of Dominion Account</u>.  Borrower shall maintain the Dominion Account pursuant to lockbox or other arrangements satisfactory to Lender, establishing Lender's control over and Lien on the lockbox and Dominion Account, and requiring immediate deposit of all remittances received in the lockbox to the Dominion Account.

**8.2.4.** <u>Proceeds of Collateral</u>.  Borrower shall request in writing and otherwise take all necessary steps to ensure that all payments on Accounts or otherwise relating to Collateral are made directly to the Dominion Account (or a lockbox relating to the Dominion Account).  If Borrower or any Subsidiary receives cash or Payment Items with respect to any Collateral, it shall hold same in trust for Lender and promptly (not later than the next Business Day) deposit same into the Dominion Account.

## 8.3. **Inventory.**

**8.3.1.** <u>Records and Reports of Inventory</u>.  Borrower shall keep accurate and complete records of its Inventory, including costs and daily withdrawals and additions, and shall submit to Lender inventory and reconciliation reports, in form and substance satisfactory to Lender (including, without limitation, reporting that is done on the lower of cost or market basis and broken down by category, which shall include a breakdown of the primary and secondary Inventory coils), on or before the 15th day of each month, and such inventory and reconciliation reports shall be prepared as of the preceding month.  Borrower shall conduct a physical inventory at least once per calendar year (and on a more frequent basis if requested by Lender when an Event of Default exists) and periodic cycle counts consistent with historical practices, and shall provide to Lender a report based on each such inventory and count promptly upon completion thereof, together with such supporting information as Lender may request.  Lender may participate in and observe each physical count.

**8.3.2.** <u>Returns of Inventory</u>.  Borrower shall not return any Inventory to a supplier, vendor or other Person, whether for cash, credit or otherwise, unless (a) such return is in the ordinary course of business; (b) no Event of Default or Overadvance exists or would result therefrom; (c) Lender is promptly

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

notified of the aggregate Value of all Inventory returned in each month; and (d) any payment received by Borrower for a return is promptly remitted to Lender for application to the Obligations.

**8.3.3.** <u>Acquisition, Sale and Maintenance</u>. Borrower shall not acquire or accept any Inventory on consignment or approval, and shall take all steps to ensure all Inventory is produced in accordance with applicable law, including the Fair Labor Standards Act of 1938 ("FLSA"). Borrower shall not sell any Inventory on consignment or approval or any other basis under which the customer may return or require Borrower to repurchase such Inventory. Borrower shall use, store and maintain all Inventory with reasonable care and caution, in accordance with applicable standards of any insurance and in conformity with all applicable law, and shall make current rent payments (within applicable grace periods provided in leases) at all locations where Collateral is located.

**8.4.** **Equipment.**

**8.4.1.** <u>Records and Schedules of Equipment</u>. Borrower shall keep accurate and complete records of its Equipment and shall submit to Lender a current schedule thereof, at the times and in form satisfactory to Lender. Promptly upon request, Borrower shall deliver to Lender evidence of its ownership or interest in any Equipment.

**8.4.2.** <u>Dispositions of Equipment</u>. Borrower shall not sell, lease or otherwise dispose of any Equipment, without the prior written consent of Lender, other than replacement of worn, damaged or obsolete Equipment with Equipment of like function and value, if the replacement Equipment is acquired substantially contemporaneously with such disposition and is free of Liens.

**8.4.3.** <u>Condition of Equipment</u>. The Equipment is and will remain in good operating condition and repair, and all necessary replacements and repairs have been and will be made so that the value and operating efficiency of the Equipment is preserved at all times, reasonable wear and tear excepted. Borrower shall not permit any Equipment to become affixed to real Property unless any landlord or mortgagee delivers a Lien Waiver.

**8.5.** **Deposit Accounts**.

(a) **Schedule 8.5** shows all Deposit Accounts maintained by Borrower, including the Dominion Accounts. Borrower shall take all actions necessary to establish Lender's control of each such Deposit Account (other than an account exclusively used for payroll, payroll taxes or employee benefits). Borrower shall be the sole account holder of each Deposit Account and shall not allow any other Person (other than Lender) to have control over or a Lien on a Deposit Account or any Property deposited therein. Borrower shall promptly notify Lender in writing of any opening or closing of a Deposit Account.

(b) Borrower is permitted to maintain the Deposit Account at Comerica Bank represented by account number 1851753507 (the "<u>Comerica Account</u>"), so long as (1) no Default or Event of Default exists, (2) the Comerica Account is used exclusively for payroll, and (3) the balance does not exceed $100,000 at any time. If the balance in the Comerica Account exceeds $100,000, Borrower shall, within one Business Day of the account threshold being exceeded, sweep the excess amount to the Dominion Account maintained at Lender.

**8.6.** **General Provisions.**

**8.6.1.** <u>Location of Collateral</u>. All tangible Collateral shall at all times be kept by Borrower at the business locations disclosed in writing to Lender on **Schedule 8.6.1**, except that Borrower may (a) make sales or other dispositions of Collateral in the ordinary course of business for fair market value; and (b) move Collateral to another location upon 30 Business Days prior written notice to Lender.

**8.6.2.** <u>Insurance of Collateral; Condemnation Proceeds</u>.

-20-

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

(a)     Borrower shall maintain insurance with respect to the Collateral, covering casualty, hazard, theft, malicious mischief, flood and other risks, in amounts and with endorsements, terms (including loss payee provisions) and insurers satisfactory to Lender in its discretion.  All proceeds under each policy shall be payable to Lender.  Upon request, Borrower shall deliver to Lender the originals or certified copies of its insurance policies, updated flood plain searches and other information relating to Borrower's insurance policies.  Each policy shall include endorsements satisfactory to Lender.  If Borrower fails to provide and pay for any insurance, Lender may, at its option, but shall not be required to, procure the insurance and charge Borrower therefor.  Without limiting the foregoing,  if any Real Estate constituting Collateral is located in a special flood hazard zone, Borrower shall maintain insurance with respect thereto covering flood and other risks, in amounts and with endorsements, terms and insurers as required by Flood Insurance Laws and otherwise satisfactory to Lender in its discretion.

(b)     Any proceeds of insurance (other than workers' compensation insurance) or condemnation of Collateral shall be paid to Lender and applied to repayment of the Obligations.

**8.6.3.**  <u>Protection of Collateral</u>.  All expenses of protecting, storing, warehousing, insuring, handling, maintaining and shipping any Collateral, all taxes or royalties payable with respect to any Collateral (including any sale thereof), and all other payments required to be made by Lender to any Person to realize on any Collateral, shall be borne and paid by Borrower.

**8.6.4.**  <u>Defense of Title</u>.  Borrower shall defend its title to Collateral and Lender's Liens therein against all Persons, claims and demands, except Permitted Liens expressly allowed to have priority over Lender's Liens.

**8.7.**  **Power of Attorney**.  Borrower hereby irrevocably constitutes and appoints Lender (and all Persons designated by Lender) as Borrower's true and lawful attorney (and agent-in-fact) for the purposes provided in this Section.  Lender or Lender's designee may, without notice and in either its or Borrower's name, but at the cost and expense of Borrower:

(a)     Endorse Borrower's name on any Payment Item or other proceeds of Collateral (including proceeds of insurance) that come into Lender's possession or control; and

(b)     During an Event of Default, (i) notify any Account Debtor of assignment of its Account(s), demand and enforce payment of Accounts, by legal proceedings or otherwise, and generally exercise any rights and remedies with respect to Accounts; (ii) settle, adjust, modify, compromise, discharge or release Accounts or other Collateral, or any legal proceedings brought to collect Accounts or Collateral; (iii) sell or assign Accounts and other Collateral upon such terms, for such amounts and at such times as Lender deems advisable; (iv) collect, liquidate and receive balances in Deposit Accounts or investment accounts, and take control, in any manner, of proceeds of Collateral; (v) endorse any Chattel Paper, Document, Instrument, bill of lading, or other document or agreement relating to Accounts, Inventory or other Collateral; and (vi) take all other actions as Lender deems appropriate to fulfill Borrower's obligations under the Loan Documents.

**SECTION 9.   REPRESENTATIONS AND WARRANTIES**

**9.1.**  **General Representations and Warranties.**   To induce Lender to enter into this Agreement and to make available the Commitment and Loans, Borrower represents and warrants that:

**9.1.1.**  <u>Organization and Qualification</u>.  Borrower and each Subsidiary is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.  Borrower and each Subsidiary is duly qualified, authorized to do business and in good standing as a foreign corporation in each jurisdiction where failure to be so qualified could reasonably be expected to have a Material Adverse Effect.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**9.1.2.** <u>Power and Authority</u>. Each Obligor is duly authorized to execute, deliver and perform its Loan Documents. The execution, delivery and performance of the Loan Documents have been duly authorized by all necessary action, and do not violate or cause a default under any Obligor's organizational documents or applicable law, license, or contract or agreement to which an Obligor is party.

**9.1.3.** <u>Enforceability</u>. Each Loan Document is a legal, valid and binding obligation of each Obligor, enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally.

**9.1.4.** <u>Capital Structure</u>. **Schedule 9.1.4** shows, for Borrower and each Subsidiary, its name, jurisdiction of organization, and holders of its equity or similar ownership interests. Except as disclosed in writing to Lender on **Schedule 9.1.4**, in the five years preceding the Closing Date, no Obligor has acquired any substantial assets from another Person nor been the surviving entity in a merger or combination.

**9.1.5.** <u>Title to Properties; Priority of Liens</u>. Borrower and Subsidiaries have good and marketable title to (or valid leasehold interests in) all of their Real Estate and good title to all personal Property, in each case free of Liens except for Permitted Liens. Borrower and Subsidiaries have paid and discharged all lawful claims that, if unpaid, could become a Lien on their Properties, other than Permitted Liens. All Liens of Lender in the Collateral are duly perfected, first priority Liens, subject only to Permitted Liens expressly allowed to have priority over Lender's Liens.

**9.1.6.** <u>Accounts</u>. Lender may rely, in determining which Accounts are Eligible Accounts, on all statements and representations made by Borrower with respect thereto. Borrower warrants, with respect to each Account at the time it is shown as an Eligible Account in a Borrowing Base Report, that:

(a)      it is genuine and in all respects what it purports to be;

(b)      it arises out of a completed, *bona fide* sale and delivery of goods or rendition of services in the ordinary course of business, and substantially in accordance with any purchase order, contract or other document relating thereto;

(c)      it is for a sum certain, maturing as stated in the applicable invoice, a copy of which has been furnished or is available upon request to Lender;

(d)      it is not subject to any offset, Lien (other than Lender's Lien), deduction, defense, dispute, counterclaim or other adverse condition except as arising in the ordinary course of business and disclosed to Lender; and it is absolutely owing by the Account Debtor;

(e)      no purchase order, agreement, document or applicable law restricts assignment of the Account to Lender (regardless of whether, under the UCC, the restriction is ineffective), and Borrower is the sole payee or remittance party shown on the invoice;

(f)      no extension, compromise, settlement, modification, credit, deduction or return has been authorized or is in process with respect to the Account, except discounts or allowances granted in the ordinary course of business for prompt payment that are reflected on the face of the invoice related thereto and in the reports submitted to Lender hereunder; and

(g)      to the best of Borrower's knowledge, (i) there are no facts or circumstances that are reasonably likely to impair enforceability or collectability of such Account; (ii) the Account Debtor had the capacity to contract when the Account arose, continues to meet Borrower's customary credit standards, is solvent, and has not failed, or suspended or ceased doing business; and (iii) there are no proceedings or actions threatened or pending against any Account Debtor that could reasonably be expected to have a material adverse effect on the Account Debtor's financial condition.

-22-

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**9.1.7.** <u>Financial Statements</u>. The consolidated and consolidating balance sheet, and related statements of income, cash flow and shareholders equity, of Borrower and Subsidiaries that have been and are hereafter delivered to Lender, are prepared in accordance with GAAP, and fairly present the financial positions and results of operations of Borrower and Subsidiaries at the dates and for the periods indicated. All projections delivered from time to time to Lender have been prepared in good faith, based on reasonable assumptions in light of the circumstances at such time. Since December 31, 2021, there has been no change in the condition, financial or otherwise, of Borrower and Subsidiaries that could reasonably be expected to have a Material Adverse Effect. No financial statement delivered to Lender at any time contains any untrue statement of a material fact, nor fails to disclose any material fact necessary to make such statement not materially misleading. Each of Borrower and Subsidiaries is solvent.

**9.1.8.** <u>Surety Obligations</u>. Borrower and Subsidiaries are not obligated as surety or indemnitor under any bond or contract that ensures payment or performance of any obligation of any Person, except as permitted hereunder.

**9.1.9.** <u>Taxes</u>. Borrower and Subsidiaries have filed all federal, state and local tax returns and other reports that they are required by law to file, and have paid, or made provision for the payment of, all taxes upon each of them, their income and their Properties that are due and payable.

**9.1.10.** <u>Brokers</u>. There are no brokerage commissions, finder's fees or investment banking fees payable in connection with any transactions contemplated by the Loan Documents.

**9.1.11.** <u>Intellectual Property</u>. Borrower and Subsidiaries own and have lawful right to use all intellectual and similar property necessary for conduct of their businesses, without conflict with any rights of others. There is no pending or, to Borrower's knowledge, threatened claim with respect to Borrower, a Subsidiary or any of their Property (including any intellectual property). Except as disclosed on **Schedule 9.1.11**, Borrower and Subsidiaries pay and owe no royalty or other compensation to any Person for use or license of any intellectual property. All intellectual property owned, used or licensed by, or otherwise subject to any interests of, Borrower and Subsidiaries is shown on **Schedule 9.1.11**.

**9.1.12.** <u>Governmental Approvals</u>. Borrower and Subsidiaries have, are in compliance with, and are in good standing with respect to, all governmental approvals necessary to conduct their businesses and to own, lease and operate their Properties.

**9.1.13.** <u>Compliance with Laws</u>. Borrower and Subsidiaries have duly complied, and their Properties and business operations are in compliance, in all material respects with all applicable laws. There have been no citations, notices or orders of material noncompliance issued to Borrower or any Subsidiary under any applicable law. No Inventory has been produced in violation of the FLSA.

**9.1.14.** <u>Compliance with Environmental Laws</u>. Except as disclosed on **Schedule 9.1.14**, none of Borrower's or any Subsidiary's past or present operations, Real Estate or other Properties are subject to a federal, state or local investigation to determine whether any remedial action is needed to address any environmental pollution, hazardous material or environmental clean-up. Borrower and Subsidiaries have not received any notice regarding any violation of environmental laws. Borrower and Subsidiaries have no contingent liability with respect to any violation of environmental law, environmental pollution or hazardous material on any Real Estate now or previously owned, leased or operated by any of them.

**9.1.15.** <u>Burdensome Contracts</u>. None of Borrower and Subsidiaries is party or subject to any contract, agreement or charter restriction that could reasonably be expected to have a Material Adverse Effect. None of Borrower or Subsidiaries is party or subject to any Restrictive Agreement, except as shown on **Schedule 9.1.15**. No Restrictive Agreement prohibits execution, delivery or performance of any Loan Document by Borrower or any Subsidiary.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**9.1.16.** Litigation.  Except as shown disclosed in writing to Lender on **Schedule 9.1.16**, there are no proceedings or investigations or any litigation pending or, to Borrower's knowledge, threatened against Borrower, a Subsidiary, or any of their businesses, operations, Properties, prospects or conditions. Except as disclosed in writing to Lender, Borrower has no Commercial Tort Claim.  Borrower and Subsidiaries are not in default under any order, injunction or judgment of a governmental authority.

**9.1.17.** No Defaults.  No event or circumstance has occurred or exists that constitutes an Event of Default.  None of Borrower and Subsidiaries is in default, and no event or circumstance has occurred or exists that with the passage of time or giving of notice would constitute a default, under any contract or agreement to which any of them is a party or is obligated for payment of Borrowed Money. There is no basis upon which any party (other than Borrower or a Subsidiary) could terminate a contract or agreement prior to its scheduled termination date.

**9.1.18.** ERISA.  Except as disclosed in writing to Lender on **Schedule 9.1.18**:

(a)     Each ERISA Plan is in compliance in all material respects with the applicable provisions of ERISA, the Internal Revenue Code, and other federal and state laws.  "ERISA" means the Employee Income Retirement Security Act of 1974, as amended from time to time.  Capitalized terms used in this section 9.1.18 have the meanings given to them in ERISA (except as otherwise defined in this Agreement).

(b)     There are no pending or, to the knowledge of Borrower, threatened claims, actions or lawsuits, or action by any governmental authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect.  There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted in or could reasonably be expected to have a Material Adverse Effect.  Borrower is not and will not be using "plan assets" (within the meaning of 29 C.F.R. §2510.3-101, as modified by ERISA Section 3(42) or otherwise) of one or more Benefit Plans with respect to its entrance into, participation in, administration of and performance of the Loans, Commitment or Loan Documents.

(c)     There has been no Reportable Event that might constitute grounds for termination of any Plan by the Pension Benefit Guaranty Corporation or for the appointment by any United States District Court of any trustee to administer any Plan.

**9.1.19.** Trade Relations.  There exists no actual or threatened termination, limitation or modification of any business relationship between Borrower or a Subsidiary and any customer or supplier, or any group of customers or suppliers, who individually or in the aggregate are material to the business of Borrower or a Subsidiary.  There exists no condition or circumstance that could reasonably be expected to impair the ability of Borrower or a Subsidiary to conduct its business at any time hereafter in substantially the same manner as conducted on the Closing Date.

**9.1.20.** Labor Relations.  Except as set forth on **Schedule 9.1.20**, none of Borrower or Subsidiaries is party to or bound by any collective bargaining agreement, management agreement or consulting agreement.  There are no material grievances, disputes or controversies with any union or other organization of Borrower's or a Subsidiary's employees, or, to Borrower's knowledge, any asserted or threatened strikes, work stoppages or demands for collective bargaining.

**9.1.21.** Payable Practices.  Borrower and Subsidiaries have not made any material change in their historical accounts payable practices from those in effect on the Closing Date.

**9.1.22.** OFAC.  None of Borrower or Subsidiaries, or any director, officer, employee, agent, affiliate or representative thereof, or any individual or entity that owns or controls Borrower or a Subsidiary, is currently the target of any Sanction or is located, organized or resident in any country or

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

territory that is the target of a Sanction. Borrower and Subsidiaries have conducted their businesses in compliance with all application anti-corruption laws.

**9.1.23.** Beneficial Ownership Certification. The information included in the most recent Beneficial Ownership Certification delivered to Lender is true and correct in all respects.

**9.2.** **Complete Disclosure.** No Loan Document contains any untrue statement of a material fact, nor fails to disclose any material fact necessary to make the statements contained therein not materially misleading. There is no fact or circumstance that Borrower has failed to disclose to Lender in writing that could reasonably be expected to have a Material Adverse Effect.

## SECTION 10. COVENANTS AND CONTINUING AGREEMENTS

**10.1.** **Affirmative Covenants.** As long as the Commitment or Obligations are outstanding, Borrower shall, and shall cause each Subsidiary to:

**10.1.1.** Inspections; Appraisals.

(a) Permit Lender to visit and inspect Borrower's and Subsidiaries' Properties, inspect, audit and make extracts from their books and records, and discuss with their officers, employees, agents, advisors and independent accountants Borrower's and Subsidiaries' business, financial condition, assets, prospects and results of operations. Borrower acknowledges that all inspections, appraisals and reports are prepared by Lender for its purposes, and Borrower shall not be entitled to rely upon them.

(b) Reimburse Lender for all its charges, costs and expenses in connection with (i) examinations of Borrower's books and records or any other financial or Collateral matters as Lender deems appropriate, up to two (2) times per Loan Year; (ii) the Post-Closing Inventory Appraisal, and (iii) all other appraisals of Inventory up to two (2) time per Loan Year; provided, that if an examination or appraisal is initiated during an Event of Default, all charges, costs and expenses relating thereto shall be reimbursed without regard to such limits. Borrower shall pay Lender's then standard charges for examination activities, including charges for its internal examination and appraisal groups, as well as the charges of any third party used for such purposes. No Borrowing Base calculation shall include Collateral acquired outside the ordinary course of business. There shall be no limit to the number of examinations or appraisals conducted by Lender while there exists a Default or Event of Default. Notwithstanding the foregoing or anything herein to the contrary, Lender may conduct one (1) additional field examination and one (1) additional appraisal in each Loan Year at Lender's own cost.

**10.1.2.** Financial and Other Information. Keep adequate records and books of account with respect to its business activities, and furnish to Lender:

(a) as soon as available, and in any event within 120 days after the close of each Fiscal Year, balance sheets as of the end of such Fiscal Year and the related statements of income, cash flow and shareholders' equity, on a consolidated and consolidating basis for Borrower and Subsidiaries, which consolidated statements shall be reviewed on standards satisfactory to Lender by a firm of independent certified public accountants of recognized standing selected by Borrower and acceptable to Lender in its discretion, and shall set forth comparative corresponding figures for the preceding Fiscal Year;

(b) as soon as available, and in any event (i) within 60 days after the end of each Fiscal Quarter, balance sheets as of the end of such Fiscal Quarter and the related statements of income, cash flow and shareholders' equity, on a consolidated and consolidating basis for Borrower and Subsidiaries, which consolidated statements shall be reviewed on standards satisfactory to Lender by a firm of independent certified public accountants of recognized standing selected by Borrower and acceptable to Lender in its discretion, and shall set forth comparative corresponding figures for the preceding Fiscal Year; and (ii)

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

within 30 days after the end of each month (but within 60 days after the last month in a Fiscal Year), unaudited balance sheets as of the end of such month and related statements of income and cash flow for such month and for the portion of the Fiscal Year then elapsed, on consolidated and consolidating basis for Borrower and its Subsidiaries, setting forth in comparative form corresponding figures for the preceding Fiscal Year and certified by Borrower's authorized officer as prepared in accordance with GAAP and fairly presenting the financial position and results of operations for such month and period, subject to normal year-end adjustments and the absence of footnotes;

(c)       concurrently with delivery of financial statements under clauses (a) and (b) above, or more frequently if requested by Lender while an Event of Default exists, a Compliance Certificate executed by an authorized officer of Borrower;

(d)       concurrently with delivery of financial statements under clause (a) above, copies of all management letters and other material reports submitted to Borrower by its accountants in connection with such financial statements;

(e)       concurrently with delivery of each Borrowing Base Report, a listing of Borrower's trade payables, specifying creditor and balance due, and a detailed trade payable aging, all in form satisfactory to Lender;

(f)       not later than 30 days after the end of each Fiscal Year, projections of Borrower's consolidated balance sheets, results of operations, cash flow and Availability for the next Fiscal Year, covering a time period acceptable to Lender month by month, and for the next three Fiscal Years, year by year; and

(g)       such other reports and information (financial or otherwise) as Lender may request from time to time in connection with any Collateral or Borrower's, any Subsidiary's or any other Obligor's identity, beneficial ownership, financial condition or business.

**10.1.3.** Notices.  Notify Lender in writing promptly of any of the following affecting Borrower or a Subsidiary: (a) threat or commencement of any lawsuit, proceeding or investigation; (b) pending or threatened labor dispute, strike or walkout; (c) default under or termination of a material contract, license or other agreement; (d) existence an Event of Default; (e) judgment in any amount; (f) violation or asserted violation of any applicable law (including ERISA, FLSA, any Sanction, or any federal, state or local environmental law); (h) any environmental contamination or pollution by, or on any Property owned, leased or occupied by, Borrower or a Subsidiary; (i) occurrence of an ERISA Event; (j) change in any accounting or financial reporting practice that affects calculation of the Borrowing Base, any Reserve or any covenant hereunder; (k) change in any information contained in a Beneficial Ownership Certificate delivered to Lender; (l) discharge, withdrawal or resignation of Borrower's independent accountants; or (m) opening or move of an office or place of business, at least 30 days prior thereto.

**10.1.4.** Landlord and Storage Agreements.  Upon request, provide Lender with copies of all existing agreements, and promptly after execution thereof provide Lender with copies of all future agreements, between Borrower and any landlord, warehouseman, processor, shipper, bailee or other Person that owns any premises at which any Collateral may be kept or that otherwise may possess or handle any Collateral.

**10.1.5.** Compliance with Laws.  Comply with all laws applicable to the conduct of Borrower's or a Subsidiary's business, including ERISA, FLSA, and all environmental anti-terrorism and tax laws; and maintain all governmental approvals necessary for ownership of Properties or conduct of business.  If any environmental contamination or pollution occurs at any Properties of Borrower or a Subsidiary, Borrower shall act promptly and diligently to investigate and report to Lender and all appropriate governmental authorities the extent of, and to make appropriate remedial action to eliminate,

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

such contamination or pollution, whether or not directed to do so by any governmental authority.

**10.1.6.** Taxes.  Pay and discharge all taxes prior to the date on which they become delinquent or penalties attach.

**10.1.7.** Insurance.  In addition to the insurance required hereunder with respect to Collateral, maintain insurance with insurers satisfactory to Lender, (a) with respect to the Properties and business of Borrower and Subsidiaries of such type, in such amounts, and with such coverages and deductibles as are customary for companies similarly situated; and (b) business interruption insurance in an amount not less than the amount of insurance maintained by Borrower as of the Closing Date, in each case with deductibles, endorsements and assignments satisfactory to Lender.

**10.1.8.** Depository Bank.  Maintain Lender as its sole depository bank, including for the maintenance of all operating, collection, disbursement and other deposit accounts and for all Cash Management Services, except, that, Borrower will be permitted to maintain the Comerica Account so long as Borrower is in compliance with **Section 8.5(b)**.

**10.1.9.** Patriot Act.  Promptly upon request therefor, information or documentation requested by Lender for purposes of compliance with applicable know-your-customer requirements under the Patriot Act, Beneficial Ownership Regulation or other applicable anti-money laundering laws.

**10.1.10.** Future Subsidiaries.  Promptly notify Lender if any Person becomes a Subsidiary and deliver any know-your-customer or other background diligence information requested by Lender with respect to such Subsidiary; and upon request, cause it to guaranty the Obligations in a manner satisfactory to Lender and to execute and deliver such documents, instruments and agreements and to take such other actions as Lender shall require to evidence and perfect a Lien in favor of Lender on all assets of such Person, including delivery of legal opinions, in form and substance satisfactory to Lender.

**10.1.11.** Post-Closing.

(a) From and after the Closing Date, Borrower agrees to take commercially reasonable efforts to deliver satisfactory Lien Waivers for (i) any leased location containing the Borrower's books and records, and (ii) any leased location, third-party logistics provider, and/or warehouse containing Borrower's Inventory.

(b) Within 10 days of the Closing Date (or such later day as Lender may agree to in writing), Borrower shall deliver, with respect to **its liability insurance policies**, (i) an insurance certificate naming Lender as **an additional insured** and using the following notice designation:  "Bank of America, N.A., and its successors and/or assigns, ATIMA, is named as Certificate Holder and the Additional Insured, One Bryant Park, New York, NY 10036"; and (ii) an additional insured endorsement that names Lender as the additional insured and provides Lender with at least 30-days prior notice of cancellation;

(c) Within 10 days of the Closing Date (or such later day as Lender may agree to in writing), Borrower shall deliver, with respect to its commercial property insurance policies, (i) an insurance certificate naming Lender as **lender's loss payee** and using the following notice designation:  "Bank of America, N.A., and its successors and/or assigns, ATIMA, is named as Certificate Holder and the Lender's Loss Payee, One Bryant Park, New York, NY 10036"; and (ii) a lender's loss payee endorsement that names Lender as the lender's loss payee and provides Lender with at least 30-days prior notice of cancellation;

**10.2.** **Negative Covenants**.  As long as the Commitment or Obligations are outstanding, Borrower shall not, and shall cause each Subsidiary not to, without Lender's prior written consent:

**10.2.1.** Debt.  Create, incur, guarantee or suffer to exist any debt or contingent liabilities except (a) Obligations; (b) trade payables incurred and paid in the ordinary course of business on normal

-27-

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

trade credit terms; (c) Borrowed Money, Subordinated Debt, and other liabilities and leases in existence on the Closing Date, as shown on **Schedule 10.2.1**; and (d) Bank Product Debt incurred in the ordinary course of business.

**10.2.2.** <u>Permitted Liens</u>.  Create or suffer to exist any Lien upon any of its Property, except the following (collectively, "<u>Permitted Liens</u>"):  (a) Liens in favor of Lender; (b) Liens for taxes not yet due; (c) easements, rights-of-way, restrictions, covenants or other agreements of record, and other similar charges or encumbrances on Real Estate, that do not secure any monetary obligation and do not interfere with Borrower's ordinary course of business; and (d) Liens existing on the Closing Date, as shown on **Schedule 10.2.2**.

**10.2.3.** <u>Reserved</u>.

**10.2.4.** <u>Distributions</u>.  Declare or make payment of any distributions, interest or dividend on the stock, Equity Interest or other ownership interests of Borrower or repurchase any stock or other ownership interests from any holder; <u>provided</u>, <u>that</u>, (a) Borrower may make payments in respect of Tax Distributions, (b) a Subsidiary may make distributions to Borrower, and (c) Borrower may make payment of any distributions, interest or dividends on the stock, Equity Interest or other ownership interests of Borrower or repurchase any stock or other ownership interests from any holder so long as Restricted Payment Conditions are satisfied.

**10.2.5.** <u>Acquisitions and Investments</u>.  (i) Acquire a business, division or substantially all assets of any Person; (ii) acquire 50% or more of the equity or other ownership interests of any Person; (iii) have or make any investment in or make any capital contribution or other transfer of assets to any Person; <u>provided</u>, <u>that</u>, notwithstanding the foregoing, Borrower may make investments: (a) existing on the Closing Date and disclosed in writing to Lender, (b) in certificates of deposit, (c) in United States treasury bills or other obligations of the United States government; or (d) to the extent not otherwise permitted under any of the foregoing provisions, acquisitions and investments made after the Closing Date with Lender's consent.

**10.2.6.** <u>Disposition of Business or Assets</u>.  Except in its ordinary course of business for fair market value, make any sale, assignment, lease, transfer, consignment, disposal or other disposition of its business or assets, including through a sale-leaseback, synthetic lease or division.

**10.2.7.** <u>Loans</u>.  Make any loan or other advance of money to any Person.

**10.2.8.** <u>Restrictions on Payment of Debt</u>.  Make any payment (whether voluntary or mandatory, or a prepayment, redemption, retirement, defeasance or acquisition) with respect to (a) Subordinated Debt, without Lender's consent or as permitted by a subordination agreement approved by Lender; or (b) other Borrowed Money (other than Obligations) prior to its due date as in effect on the Closing Date (or as amended thereafter with Lender's consent).

**10.2.9.** <u>Fundamental Changes</u>.  Amend, modify or otherwise change any of its organizational documents or agreements; change its name or conduct business under a fictitious name; change its tax, charter or other organizational identification number; change its form or state of organization; merge, combine or consolidate with any Person; liquidate, wind up its affairs or dissolve itself; dispose of substantially all its assets; or effect or unwind a division of its assets, liabilities or obligations (whether pursuant to a "plan of division" or otherwise).

**10.2.10.** <u>Subsidiaries</u>.  Form or acquire any Subsidiary after the Closing Date.

**10.2.11.** <u>Tax Consolidation</u>.  File or consent to the filing of any consolidated income tax return with any Person.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**10.2.12.** <u>Accounting Changes</u>. Make any material change in accounting treatment or reporting practices, except as required by GAAP and as permitted by **Section 1.2**, or change its Fiscal Year.

**10.2.13.** <u>Restrictive Agreements</u>. Be or become a party to any agreement that conditions or restricts an Obligor's ability to incur or repay any Obligations or to grant Liens on its assets, except (a) as in effect on the Closing Date, as shown on **Schedule 10.2.13**; or (b) constituting customary restrictions on assignment in leases and other contracts.

**10.2.14.** <u>Swaps</u>. Enter into any Swap, except to hedge risks arising in the ordinary course of business and not for speculative purposes.

**10.2.15.** <u>Conduct of Business</u>. Engage in any business, other than its business as conducted on the Closing Date and activities incidental thereto.

**10.2.16.** <u>Affiliate Transactions</u>. Enter into or be party to any transaction with an Affiliate except (a) transactions expressly permitted hereunder; (b) payment of reasonable compensation, benefits and employment incentives to officers and employees for services actually rendered, and payment of customary directors' fees and indemnities; and (c) transactions with Affiliates consummated prior to the Closing Date, as shown on **Schedule 10.2.16**.

**10.2.17.** <u>Plans; Change of Management or Control</u>. Become party to any ERISA Plan, other than any in existence on the Closing Date and disclosed in writing to Lender; or make any material change in Borrower's executive or management personnel, or permit or suffer any change in its direct or indirect capital ownership, in each case as existing on the Closing Date and disclosed to Lender in writing.

**10.3.** **<u>Financial Covenants</u>**. As long as the Commitment or Obligations are outstanding, Borrower shall:

**10.3.1.** **<u>Fixed Charge Coverage Ratio</u>**. Maintain a Fixed Charge Coverage Ratio of at least 1.0:1.0, which shall be determined as of the last day of each month as follows: (a) for the month ending August 31, 2022, for the trailing eight month period then ended, (b) for the month ending September 30, 2022, for the trailing nine month period then ended, (c) for the month ending October 31, 2022, for the trailing ten month period then ended, (d) for the month ending November 30, 2022, for the trailing eleven month period then ended, and (e) for the month ending December 31, 2022, and for all months ending thereafter, for the trailing twelve month period then ended.

## SECTION 11.  EVENTS OF DEFAULT; REMEDIES ON DEFAULT

**11.1.** **<u>Events of Default</u>**. Each of the following shall be an "Event of Default:"

(a) Borrower or any other Obligor fails to pay its Obligations when due (whether at stated maturity, on demand, upon acceleration or otherwise);

(b) Any representation, warranty or other written statement of an Obligor made in connection with any Loan Documents or transactions contemplated thereby is incorrect or misleading in any material respect when given;

(c) Borrower or any other Obligor breaches or fails to perform a covenant contained in a Loan Document;

(d) Any breach or default of any Obligor occurs under a Swap or other instrument or agreement to which it is a party or by which it or any of its Properties is bound;

(e) Any judgment or order for the payment of money is entered against any Obligor;

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

(f)        A loss, theft, damage or destruction occurs with respect to any Collateral;

(g)        Borrower is enjoined, restrained or prevented by a governmental authority from conducting a material part of its business; Borrower suffers the loss, revocation or termination of a license, permit, lease or agreement necessary to its business; there is a cessation of a material part of Borrower's business for a material period of time; material Collateral or Property of Borrower is taken or impaired through condemnation; Borrower agrees to or commences any liquidation, dissolution or winding up of its affairs; Borrower is not solvent; or any of the foregoing occurs with respect to an Obligor;

(h)        An insolvency or bankruptcy proceeding is commenced by Borrower; Borrower makes an offer of settlement, extension or composition to its unsecured creditors generally; a trustee is appointed to take possession of any substantial Property of or to operate any business of Borrower; an insolvency or bankruptcy proceeding is commenced against Borrower and Borrower consents to institution of the proceeding, the petition commencing the proceeding is not timely contested by Borrower or an order for relief is entered; or any of the foregoing occurs with respect to an Obligor;

(i)        A violation of ERISA occurs that has resulted or could reasonably be expected to result in liability of Borrower to a Plan or PBGC, or that constitutes grounds for appointment of a trustee for or termination by the PBGC of any Plan; or Borrower fails to pay when due any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan;

(j)        Borrower or any of its senior officers is criminally indicted or convicted for (i) a felony committed in the conduct of Borrower's business, or (ii) violating any state or federal law (including the Controlled Substances Act, Money Laundering Control Act of 1986 and Illegal Exportation of War Materials Act) that could lead to forfeiture of any material Property or any Collateral; or

(k)        A Change of Control occurs; or any event occurs or condition exists that has a Material Adverse Effect.

**11.2.    Remedies upon Default.** If an Event of Default under **Section 11.1(h)** occurs, then to the extent permitted by applicable law, all Obligations shall become automatically due and payable and the Commitment shall terminate, without any action by Lender or notice of any kind. In addition, or if any other Event of Default exists, Lender may in its discretion do any one or more of the following from time to time:

(a)        declare any Obligations immediately due and payable, whereupon they shall be due and payable without diligence, presentment, demand, protest or notice of any kind, all of which are hereby waived by Borrower to the fullest extent permitted by law;

(b)        terminate, reduce or condition the Commitment or Loan, or adjust the Borrowing Base;

(c)        require Borrower to Cash Collateralize all Bank Product Debt and other Obligations that are contingent or not yet due and payable, and if Borrower fails to deposit such Cash Collateral, Lender may advance the required Cash Collateral as Loans; and

(d)        exercise any other rights or remedies afforded under any agreement, by law, at equity or otherwise, including the rights and remedies of a secured party under the UCC. Such rights and remedies include the rights to (i) take possession of any Collateral; (ii) require Borrower to assemble Collateral, at Borrower's expense, and make it available to Lender at a place designated by Lender; (iii) enter any premises where Collateral is located and store Collateral on such premises until sold (and if the premises are owned or leased by Borrower, Borrower agrees not to charge for such storage); and (iv) sell or otherwise dispose of any Collateral in its then condition, or after any further manufacturing or processing thereof, at public or private sale, with such notice as may be required by applicable law, in lots or in bulk,

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

at such locations, all as Lender, in its discretion, deems advisable. Borrower agrees that 10 days notice of any proposed sale or other disposition of Collateral by Lender shall be reasonable, and that any sale conducted on the internet or to a licensor of intellectual property shall be commercially reasonable. Lender may conduct sales on Borrower's premises, without charge, and any sales may be adjourned from time to time in accordance with applicable law. Lender shall have the right to sell, lease or otherwise dispose of any Collateral for cash, credit or any combination thereof, and Lender may purchase any Collateral at public or, if permitted by law, private sale and, in lieu of actual payment of the purchase price, may set off the amount of such price against the Obligations. No monies or Collateral proceeds obtained from an Obligor shall be applied to its Excluded Swap Obligations, but Lender may apply and reapply Collateral proceeds and amounts received from other sources to maximize repayment of Obligations.

**11.3.** **License.** Lender is hereby granted an irrevocable, non-exclusive license or other right to use, license or sub-license (without payment of royalty or other compensation to any Person) any or all intellectual property of Borrower, computer hardware and software, trade secrets, brochures, customer lists, promotional and advertising materials, labels, packaging materials and other Property, in advertising for sale, marketing, selling, collecting, completing manufacture of, or otherwise exercising any rights or remedies with respect to, any Collateral. Borrower's rights and interests under intellectual property shall inure to Lender's benefit.

**11.4.** **Setoff.** At any time during an Event of Default, Lender and its Affiliates are authorized, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations at any time owing by Lender or such Affiliate to or for the credit or the account of any Obligor against the Obligations, whether or not Lender or such Affiliate shall have made any demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or are owed to a branch or office of Lender or such Affiliate different from the branch or office holding such deposit or obligated on such indebtedness. The rights of Lender and each such Affiliate under this Section are in addition to other rights and remedies (including other rights of setoff) that such Person may have.

### 11.5. Remedies Cumulative; No Waiver.

**11.5.1.** Cumulative Rights. All agreements, warranties, guaranties, indemnities and other undertakings of Obligors under the Loan Documents are cumulative and not in derogation of each other. The rights and remedies of Lender under the Loan Documents are cumulative, may be exercised at any time and from time to time, concurrently or in any order, and are not exclusive of any other rights or remedies available by agreement, by law, at equity or otherwise. All such rights and remedies shall continue in full force and effect until full payment of all Obligations.

**11.5.2.** Waivers. No waiver or course of dealing shall be established by (a) the failure or delay of Lender to require strict performance by any Obligor under any Loan Document, or to exercise any rights or remedies with respect to Collateral or otherwise; (b) the making of a Loan during a Default, Event of Default or other failure to satisfy any condition precedent; or (c) acceptance by Lender of payment or performance by an Obligor in a manner other than that specified in the Loan Documents. Any failure to satisfy a financial covenant on a measurement date shall not be cured or remedied by satisfaction of such covenant on a subsequent date.

## SECTION 12. MISCELLANEOUS

**12.1.** **Amendments and Waivers.** This Agreement shall be binding upon and inure to the benefit of Borrower, Lender and their respective successors and assigns, but Borrower may not assign its rights or obligations under any Loan Document without the prior written consent of Lender. No Modification of a Loan Document shall be effective without the written agreement of Lender and Borrower; provided, that only the consent of the parties to a Bank Product agreement shall be required for its Modification. Any waiver or consent granted by Lender shall be effective only if in writing and only for the matter specified. Any increase, extension or renewal

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

of the credit facility hereunder shall be subject to flood insurance due diligence and compliance satisfactory to Lender in its discretion.

**12.2.** **Indemnity.** **BORROWER SHALL INDEMNIFY AND HOLD HARMLESS EACH INDEMNITEE AGAINST ANY CLAIM THAT MAY BE INCURRED BY OR ASSERTED AGAINST IT, INCLUDING CLAIMS ASSERTED BY ANY OBLIGOR OR ANY OTHER PERSON OR ARISING FROM THE NEGLIGENCE OF AN INDEMNITEE.** In no event shall any party to a Loan Document have any obligation thereunder to indemnify or hold harmless an Indemnitee with respect to a Claim that is determined in a final, non-appealable judgment by a court of competent jurisdiction to result from the gross negligence or willful misconduct of such Indemnitee.

**12.3.** **Notices and Communications.**

**12.3.1.** Notice Address. All Communications by or to a party hereto shall be in writing and be given to a party at its address shown on the signature pages hereof, or at such other address as a party may hereafter specify by notice in accordance with this **Section 12.3**. In addition, a Communication from Lender to an Obligor may, to the extent permitted by law, be delivered electronically by (i) transmitting the Communication to the electronic address specified by Borrower to Lender in writing from time to time, or (ii) posting the Communication on a website and sending the Obligor notice (electronically or otherwise) that the Communication has been posted and providing instructions (at such time or prior to posting) for viewing it. Each Communication shall be effective only (a) if given by facsimile transmission, when transmitted to the applicable facsimile number, if confirmation of receipt is received; (b) if given by mail, three Business Days after deposit in the U.S. mail, with first-class postage pre-paid, addressed to the applicable address; (c) if given by personal delivery, when duly delivered to the notice address with receipt acknowledged; (d) if given by overnight commercial service, upon receipt as evidenced by written confirmation from the overnight service; and (e) if provided electronically by Lender to Borrower, when the Communication (or notice advising of its posting to a website) is sent to Borrower's electronic address. Notwithstanding the foregoing, no notice to Lender shall be effective until actually received by the individual to whose attention at Lender such notice is required to be sent. Any written Communication that is not sent in conformity with the foregoing provisions shall nevertheless be effective on the date actually received by the noticed party.

**12.3.2.** Communications. Electronic and telephonic Communications (including e-mail, messaging, voice mail and websites) may be used only in a manner acceptable to Lender. Lender makes no assurance as to the privacy or security of electronic or telephonic Communications. E-mail and voice mail are not effective notices under the Loan Documents.

**12.3.3.** Platform. Borrower Materials shall be delivered pursuant to procedures approved by Lender, including electronic delivery (if requested by Lender) to an electronic platform maintained by it. Borrower shall notify Lender of each posting of Borrower Materials on the platform and materials shall be deemed received by Lender only upon its receipt of such notice. The platform is provided "as is" and "as available." Lender does not warrant adequacy or functioning of the platform, and expressly disclaims liability for any issues involving it. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS, OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY LENDER WITH RESPECT TO THE PLATFORM. Indemnitees shall have no liability to Obligors or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) relating to use by any Person of the platform, including any unintended recipient, nor for delivery of information via the platform, internet, e-mail, or any other electronic platform or messaging system.

**12.3.4.** Non-Conforming Communications. Lender may rely on any Communication purportedly given by or on behalf of an Obligor even if it is not made in a manner specified herein,

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

incomplete or not confirmed, or if the terms thereof, as understood by the recipient, vary from an earlier Communication or later confirmation. Borrower shall indemnify and hold harmless each Indemnitee from any liabilities, losses, costs and expenses arising from any Communication purportedly given by or on behalf of any Obligor.

**12.3.5.** <u>Reliance on Communications</u>. Lender shall not be responsible for or have any duty to ascertain or inquire into the sufficiency, validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document (including, for the avoidance of doubt, in connection with an Electronic Signature transmitted by telecopy, emailed .pdf or other electronic means). Lender may rely on, and shall incur no liability in respect of any Loan Document by acting on, any Communication (which may be a fax, electronic message, internet or intranet website posting, or other distribution, or signed by an Electronic Signature) or any statement made to it orally or by telephone and believed by it to be genuine and signed or sent or otherwise authenticated (whether or not such Person in fact meets the requirements set forth in the Loan Documents for being the maker thereof). Lender shall be entitled to rely on the e-mail addresses and telephone numbers provided by Obligors and their authorized representatives. Each Obligor hereby waives (a) any argument, defense or right to contest the legal effect, validity or enforceability of any Loan Document or other Communication based solely on the lack of a paper original copy thereof, and (b) waives any claim against any Indemnitee for liabilities arising from its reliance on or use of Electronic Signatures, including liabilities relating to an Obligor's failure to use a security measure in connection with execution, delivery or transmission of an Electronic Signature.

**12.4.** **Performance of Borrower's Obligations.** Lender may, in its discretion at any time and from time to time, at Borrower's expense, pay any amount or do any act required of Borrower under any Loan Documents or otherwise lawfully requested by Lender to (a) enforce any Loan Documents or collect any Obligations; (b) protect, insure, maintain or realize upon any Collateral; or (c) defend or maintain the validity or priority of Lender's Liens in any Collateral, including any payment of a royalty, judgment, insurance premium, warehouse charge, finishing or processing charge, landlord claim, or discharge of a Lien. All payments, costs, fees and expenses of Lender under this Section shall be reimbursed by Borrower, **on demand**, with interest from the date incurred until paid in full, at the Default Rate. Any payment made or action taken by Lender under this Section shall be without prejudice to any right to assert an Event of Default or to exercise any other rights or remedies under the Loan Documents.

**12.5.** **Credit Inquiries.** Lender may (but shall have no obligation) to respond to usual and customary credit inquiries from third parties concerning Borrower.

**12.6.** **Severability.** Wherever possible, each provision of the Loan Documents shall be interpreted in such manner as to be valid under applicable law. If any provision is found to be invalid under applicable law, it shall be ineffective only to the extent of such invalidity and the remaining provisions of the Loan Documents shall remain in full force and effect.

**12.7.** **Cumulative Effect; Conflict of Terms.** The provisions of the Loan Documents are cumulative. The parties acknowledge that the Loan Documents may use several limitations or measurements to regulate similar matters, and they agree that these are cumulative and that each must be performed as provided. Except as otherwise provided in another Loan Document (by specific reference to the applicable provision of this Agreement), if any provision contained herein is in direct conflict with any provision in another Loan Document, the provision herein shall govern and control.

**12.8.** **Counterparts; Execution; Electronic Signatures.** Any Loan Document, including any required to be in writing, may (if agreed by Lender) be in the form of an Electronic Record and may be executed using Electronic Signatures. An Electronic Signature on or associated with any Communication shall be valid and binding on each Obligor and other party thereto to the same extent as a manual, original signature, and any Communication entered into by Electronic Signature shall constitute the legal, valid and binding obligation of each party, enforceable to the same extent as if a manually executed original signature were delivered. A

7038325.8

23-46098-mlo    Doc 59-1    Filed 08/01/23    Entered 08/01/23 12:28:37    Page 53 of 87

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Communication may be executed in as many counterparts as necessary or convenient, including both paper and electronic counterparts, but all such counterparts are one and the same Communication. The parties may use or accept manually signed paper Communications converted into electronic form (such as scanned into pdf), or electronically signed Communications converted into other formats, for transmission, delivery and/or retention. Lender may, at its option, create one or more copies of a Communication in the form of an imaged Electronic Record ("Electronic Copy"), which shall be deemed created in the ordinary course of its business, and may destroy the original paper document. Any Communication in the form of an Electronic Record, including an Electronic Copy, shall be considered an original for all purposes, and shall have the same legal effect, validity and enforceability as a paper record. Notwithstanding anything herein, (a) Lender is under no obligation to accept an Electronic Signature in any form or format unless expressly agreed by it pursuant to procedures approved by it; (b) Lender is entitled to rely on an Electronic Signature purportedly given by or on behalf of an Obligor without further verification and regardless of the appearance or form of such Electronic Signature; and (c) upon request by Lender, any Loan Document using an Electronic Signature shall be promptly followed by a manually executed, original counterpart. "Electronic Record" and "Electronic Signature" are defined in 15 U.S.C. §7006.

      **12.9.** **Entire Agreement.** Time is of the essence with respect to all Loan Documents and Obligations. The Loan Documents constitute the entire agreement, and supersede all prior understandings and agreements, among the parties relating to the subject matter thereof.

      **12.10.** **No Control; No Fiduciary Responsibility.** Nothing in any Loan Document and no action of Lender pursuant to any Loan Document shall be deemed to constitute control of Borrower by Lender, and Lender has no fiduciary, agency or similar duty of any kind to Borrower or any other Obligor. In connection with all aspects of each transaction contemplated by the Loan Documents, Borrower acknowledges and agrees that (a) this credit facility and all related services by Lender or its Affiliates are arm's-length commercial transactions between Borrower and such Person; and (b) Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated by the Loan Documents. Lender and its related entities may engage in activities that affect any reference interest rate or related spread or adjustment, in a manner adverse to Borrower. Lender may use information source(s) to ascertain reference rates and related matters in its discretion and shall have no liability to Borrower for any error, act or omission affecting the selection, determination or calculation of any rate or related matter.

      **12.11.** **Confidentiality.** Lender shall maintain the confidentiality of all Information, but may disclose it (a) to Indemnitees (including prospective providers of Bank Products) informed of the confidential nature of the Information and instructed to keep it confidential; (b) as requested by any governmental, regulatory or self-regulatory authority purporting to have jurisdiction over it or its Affiliates; (c) as required by law, court order, subpoena, or other legal, governmental or regulatory request or process; (d) to any Obligor or other party hereto; (e) in connection with any action or proceeding relating to any Loan Documents or Obligations; (f) to the extent such Information is (i) publicly available other than as a result of a breach of this Section, (ii) available to Lender or its Affiliates on a nonconfidential basis from a source other than Borrower, or (iii) independently discovered or developed by Lender without utilizing any Information or violating this Section; (g) on a confidential basis to a provider of a loan platform; or (h) with the consent of Borrower. Borrower consents to Lender's publication of customary advertising material relating to transactions contemplated hereby, using the names, product photographs, logos or trademarks of Borrower and Subsidiaries. As used herein, "Information" means information received from Borrower relating to it or its business that is identified as confidential when delivered. Borrower authorizes Lender to discuss Borrower's financial affairs and business operations with any accountants, auditors, business consultants or other professional advisors employed by Borrower, and authorizes such parties to disclose to Lender such financial and business information or reports (including management letters) concerning Borrower as Lender may request. Lender is not holding Borrower to any confidentiality obligations with respect to any U.S. federal or state tax material provided, or federal or state tax comments made, by Lender.

      **12.12.** **Governing Law.** **UNLESS EXPRESSLY PROVIDED IN ANY LOAN DOCUMENT, THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ALL CLAIMS SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ANY CONFLICT**

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

OF LAW PRINCIPLES EXCEPT FEDERAL LAWS RELATING TO NATIONAL BANKS.

   12.13. <u>Consent to Forum</u>.

      12.13.1. <u>Forum</u>.   **BORROWER HEREBY CONSENTS TO THE EXCLUSIVE JURISDICTION OF ANY STATE COURT SITTING IN NEW YORK COUNTY, NEW YORK OR THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, IN ANY DISPUTE, ACTION, LITIGATION OR OTHER PROCEEDING RELATING IN ANY WAY TO ANY LOAN DOCUMENTS, AND AGREES THAT ANY DISPUTE, ACTION, LITIGATION OR OTHER PROCEEDING SHALL BE BROUGHT BY IT SOLELY IN ANY SUCH COURT.   BORROWER IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL CLAIMS, OBJECTIONS AND DEFENSES THAT IT MAY HAVE REGARDING ANY SUCH COURT'S PERSONAL OR SUBJECT MATTER JURISDICTION, VENUE OR INCONVENIENT FORUM. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 12.3.1.** A final judgment in any proceeding of any such court shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or any other manner provided by applicable law.

      12.13.2. <u>Other Jurisdictions</u>.  Nothing herein shall limit the right of Lender to bring proceedings against Borrower in any other court nor the right of any party to serve process in any other manner permitted by applicable law.  Nothing in this Agreement shall be deemed to preclude enforcement by Lender of any judgment or order obtained in any forum or jurisdiction.

   **12.14. <u>Waivers by Borrower</u>.  To the fullest extent permitted by applicable law, Borrower waives (a) the right to trial by jury (which Lender hereby also waives) in any proceeding or dispute of any kind relating in any way to any Loan Documents, Obligations or Collateral; (b) presentment, demand, protest, notice of presentment, default, non-payment, maturity, release, compromise, settlement, extension or renewal of any commercial paper, accounts, documents, instruments, chattel paper and guaranties at any time held by Lender on which Borrower may in any way be liable, and hereby ratifies anything Lender may do in this regard; (c) notice prior to taking possession or control of any Collateral; (d) any bond or security that might be required by a court prior to allowing Lender to exercise any rights or remedies; (e) the benefit of all valuation, appraisement and exemption laws; (f) any claim against Lender, on any theory of liability, for special, indirect, consequential, exemplary or punitive damages (as opposed to direct or actual damages) in any way relating to any Enforcement Action, Obligations, Loan Documents or transactions relating thereto; and (g) notice of acceptance hereof.** Borrower acknowledges that the foregoing waivers are a material inducement to Lender entering into this Agreement and that Lender is relying upon the foregoing in its dealings with Borrower.  Borrower has reviewed the foregoing waivers and has knowingly and voluntarily waived its jury trial and other rights.  In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

   12.15. <u>Patriot Act Notice</u>.  Lender hereby notifies Borrower that pursuant to the Patriot Act, Lender is required to obtain, verify and record information that identifies Borrower, including its legal name, address, tax ID number and other information that will allow Lender to identify it in accordance with the Patriot Act.  Lender will also require information regarding any personal guarantor and may require information regarding Borrower's management and owners, such as legal name, address, social security number and date of birth.  Borrower shall, promptly upon request, provide all documentation and other information as Lender may request from time to time in order to comply with any obligations under know-your-customer, anti-money laundering or other requirements of applicable law, including the Patriot Act and Beneficial Ownership Regulation.

   12.16. <u>Acknowledgement Regarding Any Supported QFCs</u>.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for any Swap or any other agreement or instrument that is a QFC (such support, "<u>QFC Credit Support</u>", and each such QFC, a "<u>Supported QFC</u>"), the parties

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)      In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States.  Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a defaulting Lender (to the extent applicable in this Agreement) shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)      As used in this Section 12.16, the following terms have the following meanings:

 "BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Covered Entity" means any of the following:  (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

**12.17. NO ORAL AGREEMENT**.  **THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS BETWEEN THE PARTIES.  THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES.**

[Signature Pages Follow]

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**IN WITNESS WHEREOF,** this Agreement has been executed and delivered as of the date set forth above.

**LENDER**:

**BANK OF AMERICA, N.A.**

By: _____

Title: _____

Address:

        One Bryan Park
        New York, New York 10036
        Attn: Portfolio Manager
        Email: steven.blumberg@bofa.com

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

[Loan and Security Agreement]

**BORROWER**:

**RAPID METALS, LLC**

By: _____

Title: _____

Address:

     7031 Orchard Lake Road, Suite 203
     W. Bloomfield, MI 48322
     Attn: Dan Butler
     Email: danb@rapidmetals.com
     Telecopy:

[Loan and Security Agreement]

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

SCHEDULES
to
Loan and Security Agreement


See Attached.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

SCHEDULE 8.6.1
to
Loan and Security Agreement

**BUSINESS LOCATIONS**

1. Borrower currently has the following business locations:

   Chief Executive Office: 7031 Orchard Lake Road, Suite 203, W. Bloomfield, MI 48322

   Other Locations: N/A

2. Each Subsidiary currently has the following business locations: N/A

   Chief Executive Office:

   Other Locations:

3. In the five years preceding the Closing Date, Borrower and Subsidiaries have had the following business locations in addition to those set forth above: 7031 Orchard Lake Road, Suite 101, W. Bloomfield, MI 48322.

4. The following bailees, warehouseman, similar parties and consignees hold inventory of Borrower or a Subsidiary: The list below is as of September 7, 2022

| Name and Address of Party | Nature of Relationship | Amount of Inventory | Owner of Inventory |
|---|---|---|---|
| See attached Vendor List | | | |
| | | | |
| | | | |
| | | | |

5. Designated Locations: Top 10 Inventory Locations

   -Alpine Slitting/Steel Processing, 9301 Central, Detroit, Michigan 48204
   -Andes Coil Processors, 201 Mississippi St., Gary, Indiana 46402
   -Coil Steel Processing, LLC, 1604 Prosperity Road, Toledo, Ohio 43612
   -Feralloy Corporation – Decatur, 1435 Red Hat Road, Decatur, Alabama 35601
   -Fulton County Processing, 7800 State Route 109, Delta, Ohio 43515
   -Hascall Steel – Nashville, 407 Driftwood, Nashville, Tennessee 37210
   -Heidtman Steel, 6118 County Road 42, Butler, Indiana 46721
   -Mak Steel Pickling, 4343 Wyoming, Dearborn, Michigan 48126
   -Ohio Pickling & Processing, 1149 Campbell Street, Toledo, Ohio 43607
   -Wayne Industries, 36253 Michigan Ave., Wayne, Michigan 48184

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

SCHEDULE 8.5
to
Loan and Security Agreement

**DEPOSIT ACCOUNTS**

| Depository Bank | Type of Account | Account Number |
|---|---|---|
| Bank of America | Checking | 375011509555 |
| Comerica Bank | Checking | 1851753507 |
| | | |
| | | |

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

SCHEDULE 9.1.4
to
Loan and Security Agreement

## NAMES AND CAPITAL STRUCTURE

1.     The corporate names, jurisdictions of incorporation, and authorized and issued Equity Interests of Borrower and each Subsidiary are as follows:

| Name | Jurisdiction | Number and Class of Authorized Shares | Number and Class of Issued Shares |
|---|---|---|---|
| Rapid Metals, LLC | Michigan | See Operating Agreement, as amended | See Operating Agreement, as amended |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

2.     The record holders of Equity Interests of Borrower and each Subsidiary are as follows:

| Name | Class of Stock | Number of Shares | Record Owner |
|---|---|---|---|
| Rapid Metals, LLC | Member Units | 52% | Daniel Butler |
| Rapid Metals, LLC | Member Units | 48% | Lisa Butler |
|  |  |  |  |
|  |  |  |  |

3.     All agreements binding on any holder of Equity Interests of Borrower and Subsidiaries with respect to such interests are as follows: See Operating Agreement, as amended.

4.     In the five years preceding the Closing Date, none of Borrower and Subsidiaries has acquired any substantial assets from any other Person nor been the surviving entity in a merger or combination, except:

See Operating Agreement, as amended.

7058325.5

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

SCHEDULE 9.1.5
to
Loan and Security Agreement

## **REAL ESTATE IN SPECIAL FLOOD HAZARD ZONE**

1.      Borrower has the following Real Estate located in a Special Flood Hazard Zone: N/A

Address:

Address:


2.      Subsidiaries have the following Real Estate located in a Special Flood Hazard Zone: N/A

Property Owner and Address:

Property Owner and Address:

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

SCHEDULE 9.1.11
to
Loan and Security Agreement

## PATENTS, TRADEMARKS, COPYRIGHTS AND LICENSES

1.  Borrower's and Subsidiaries' patents: N/A

| Patent | Owner | Status in Patent Office | Federal Registration No. | Registration Date |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

2.  Borrower's and Subsidiaries' trademarks: N/A

| Trademark | Owner | Status in Trademark Office | Federal Registration No. | Registration Date |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

3.  Borrower's and Subsidiaries' copyrights: N/A

| Copyright | Owner | Status in Copyright Office | Federal Registration No. | Registration Date |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

4.  Borrower's and Subsidiaries' licenses (other than routine business licenses, authorizing them to transact business in local jurisdictions): N/A

| Licensor | Description of License | Term of License | Royalties Payable |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

SCHEDULE 9.1.14
to
Loan and Security Agreement

**ENVIRONMENTAL MATTERS**

N/A

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

SCHEDULE 9.1.15
to
Loan and Security Agreement

**RESTRICTIVE AGREEMENTS**

| Entity | Agreement | Restrictive Provisions |
|---|---|---|
| Bank of America | Loan Agreement dtd 1-9-13 | Per Terms |
| | | |
| | | |

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

SCHEDULE 9.1.16
to
Loan and Security Agreement

## **LITIGATION**

1.    Proceedings and investigations pending against Borrower or any Subsidiary:

Rapid Metals, LLC v XJR Capital Management LLC et al, Oakland County Circuit Court, Case No. 22-193685 CB

XJR Capital Management LLC v Rapid Metals, LLC. US District Court ND of Ohio, Case No. 3:22-cv-751

2.    Threatened proceedings or investigations of which Borrower or any Subsidiary is aware: N/A

3.    Pending Commercial Tort Claim(s) of any Obligor: N/A

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

7038325.5

SCHEDULE 9.1.18
to
Loan and Security Agreement

**<u>PENSION PLAN DISCLOSURES</u>**

N/A

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

SCHEDULE 9.1.20
to
Loan and Security Agreement

## **LABOR RELATIONS**

N/A

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

SCHEDULE 10.2.1
to
Loan and Security Agreement

**<u>BORROWED MONEY</u>**

Bank of America, Loan Agreement, dtd 1-9-13, loan no. 10014955

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

SCHEDULE 10.2.2
to
Loan and Security Agreement

**<u>EXISTING LIENS</u>**

Bank of America, Loan Agreement, dtd 1-9-13, loan no. 10014955

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

SCHEDULE 10.2.13
to
Loan and Security Agreement

**RESTRICTIVE AGREEMENTS**

None other than Bank of America, Loan Agreement, dtd 1-9-13, loan no. 10014955

7038325.5

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

SCHEDULE 10.2.16
to
Loan and Security Agreement

## EXISTING AFFILIATE TRANSACTIONS

N/A

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

# Exhibit B
(Notice of Default)

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**BANK OF AMERICA, N.A.**
One Bryant Park
New York, New York 10036

**NOTICE OF DEFAULT/RESERVATION OF RIGHTS**

June 12, 2023

**RAPID METALS, LLC**
7031 Orchard Lake Road, Suite 203
West Bloomfield, MI 48322
Attn: Dan Butler
Email: danb@rapidmetals.com

Re: Loan and Security Agreement, dated November 9, 2022 (as heretofore amended, restated, renewed, extended, supplemented, substituted or otherwise modified, the "<u>Loan Agreement</u>"), between Rapid Metals, LLC ("<u>Borrower</u>") and Bank of America, N.A. ("<u>Lender</u>").

Ladies and Gentlemen:

Reference is hereby made to the Loan Agreement. Capitalized terms not otherwise defined herein shall have the respective meanings assigned to such terms in the Loan Agreement.

Notice is hereby given to Borrower that an Event of Default under Section 11.1(c) of the Loan Agreement has occurred and is continuing as a result of, without limitation, Borrower's failure to deliver:

(a) Borrower's reviewed annual balance sheet for the Fiscal year ending December 31, 2022, together with the Related Reporting, as required by section 10.1.2(a) of the Loan Agreement;

(b) Borrower's reviewed quarterly balance sheets for the Fiscal Quarters ending December 31, 2022 and March 31, 2023, together with the Related Reporting, as required by Section 10.1.2(b)(i) of the Loan Agreement;

(c) Borrower's Compliance Certificate for the months ending November 30, 2022, December 31, 2022, January 31, 2023, February 28, 2023, March 31, 2023, and April 30, 2023, as required by Section 10.1.2(c) of the Loan Agreement;

(d) Projections of Borrower's consolidated balance sheets, results of operations, cash flow and Availability for the Fiscal Year ending December 31, 2023, covering a time period acceptable to Lender month by month, and for the next three Fiscal Years, year by year, as required by Section 10.1.2(f) of the Loan Agreement; and

(e) Borrower's weekly Borrowing Base Reports for each week in the month of May, as well as the Borrowing Base Report for the week ending June 2, 2023, in each case, as required by Sections 8.1, 8.2 and 10.1.2(e) of the Loan Agreement.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Each of the foregoing Events of Default shall be collectively referred to as the "Specified Defaults." As used above, "Related Reporting" means, with respect to clauses (a) and (b) above, the related statements of income, cash flow and shareholders' equity for the applicable period, on a consolidated and consolidating basis for Borrower and its Subsidiaries, which consolidated statements shall be reviewed on standards satisfactory to Lender by a firm of independent certified public accountants of recognized standing selected by Borrower and acceptable to Lender in its discretion, setting forth comparative corresponding figures for the preceding Fiscal Year.

With respect to clause (e), please note an Increased Reporting Trigger Period currently exists and, as such, Borrowing Base Reports are to be delivered on a weekly basis by the Tuesday of each week (prepared for the previous week), in accordance with Sections 8.1, 8.2 and 10.1.2(e) of the Loan Agreement.

This letter confirms that the Lender has not waived the Specified Defaults, and the Lender hereby expressly reserves all of its rights, powers, privileges and remedies under the Loan Agreement, the other Loan Documents, applicable law and otherwise with respect to any Event of Default (including, without limitation, the Specified Defaults) now existing or hereafter arising under the Loan Agreement or any of the other Loan Documents, including, without limitation, (a) the right to declare the Commitment to be terminated, (b) the right to demand immediate full payment of all Obligations owing under the Loan Agreement and the other Loan Documents, and (c) the right to repossess and take other action with respect to any or all Collateral, including, without limitation, the liquidation thereof pursuant to the security interests granted under the Loan Documents. The failure of the Lender to exercise any such rights, powers, privileges and remedies is not intended, and shall not be construed, to be a waiver of any such Event of Default (including, without limitation, the Specified Defaults). The Lender may elect to exercise any or all of its rights, at its sole option, at any time hereafter, without the necessity of any further notice, demand or other action on the part of the Lender.

This letter will serve to advise Borrower that, as provided by Section 3.1.1 of the Loan Agreement, Lender may elect, and reserves the right, to charge interest on the Obligations at the Default Rate, which election may be made by Lender during the continuance of any of the Specified Defaults or any other Event of Default. Borrower is further advised that acceptance heretofore or hereafter of payments tendered by Borrower at any time in respect of payments made or due after the occurrence and during the continuance of an Event of Default (including, without limitation, the Specified Defaults) shall not constitute a waiver of the right to receive payment of interest accruing at the Default Rate and other fees, costs and other amounts which are due or become due under the Loan Agreement, any Loan Document, and applicable law.

From and after the date hereof, the Lender may, in its sole and absolute discretion, continue to make Loans to Borrower. No action or inaction on the part of the Lender, including, without limitation, the discretionary making of Loans, shall be deemed to be a waiver of any rights or remedies available to the Lender with respect to the Specified Defaults or any other Default or Event of Default that may now or hereafter exist under the Loan Agreement or the other Loan Documents. Nothing contained herein shall be construed as to limit the Lender's ability to exercise any rights or remedies under the Loan Agreement, the other Loan Documents, applicable law or otherwise.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Nothing contained in this letter and no delay by the Lender in exercising any rights, powers, privileges or remedies under the Loan Agreement, any other Loan Document, or applicable law with respect to the Specified Defaults or any other Default or Event of Default now existing or hereafter arising under the Loan Agreement or any of the other Loan Documents shall be construed as a waiver or modification of such rights, powers, privileges and remedies. This letter is not, and shall not be deemed to be, a waiver of, or a consent to, any default, noncompliance, Default or Event of Default (including, without limitation, the Specified Defaults) now existing or hereafter arising under the Loan Agreement or any of the other Loan Documents. This letter shall not entitle any Obligor to any other or further demand, presentment, protest, or notice of any kind.

The holding of any discussions between the Lender and the Obligors regarding the administration of the Loans or proposals regarding amendments to, or modifications or restructurings of the Loan Agreement or any other Loan Document shall not constitute any waiver of any Default or Event of Default (including, without limitation, the Specified Defaults), or an agreement to forbear from the exercise of the Lender's rights and remedies under the Loan Agreement or any other Loan Document, or applicable law, nor shall it be construed as an undertaking by the Lender to continue such discussions or to enter into any such amendments, modifications or restructurings.

[Signature Page Follows]

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Very truly yours,

**BANK OF AMERICA, N.A.**

By:_____

Name: JANG KIM

Title: VP

[Notice of Default/Reservation of Rights – Rapid Metals, LLC]

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

# Exhibit C
(April and May 2023 Comerica Statements)

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

80144

RAPID METALS LLC
7031 ORCHARD LAKE RD
STE 203
W BLOOMFIELD MI 48322-3656

*Small Business Checking*
**statement**

**April 1, 2023** to **April 30, 2023**
**Account number** ████3507

# Account summary

To contact us

**Call**
(800) 643-4418
Hearing impaired (TDD 800 822-6546)

| | |
|---|---|
| **Beginning balance on April 1, 2023** | **$239,825.60** |
| Plus deposits | |
| Electronic deposits | $2,219,769.95 |
| | |
| Less withdrawals | |
| Checks | -$620,000.00 |
| Electronic (EFT) withdrawals | -$1,410,906.39 |
| Other withdrawals | -$9,910.00 |
| Fees and service charges | -$8.50 |
| | |
| **Ending balance on April 30, 2023** | **$418,770.66** |

**Visit our web site**
www.comerica.com

**Write to us**
COMERICA   BANK
PO BOX 75000
DETROIT, MI 48275-8144

**Important information**

The Account Balance Fee for this statement period for this account is $0.00/$1,000.

**Thank you**

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

## *Small Business Checking* account details: ███3507

### Electronic deposits this statement period

| | | | Reference numbers | |
|---|---|---|---|---|
| Date | Amount | Activity | Customer | Bank |
| Apr 04 | 13,169.16 | M. D. Metals, IN ACH Pmt 230404 11015235347 | | 868 |
| Apr 05 | 36,730.00 | Mmc Misc Cash Disb Rapid Metals Ll | | 225 |
| Apr 07 | 22,555.68 | Priefert Mfg Corp Pay V-021290 | | 469 |
| Apr 11 | 47,016.46 | M. D. Metals, IN ACH Pmt 230411 11015829099 | | 034 |
| Apr 11 | 28,176.00 | Wire # 003585 Org Davis Gate & W Fed # 000230 | | 489 |
| Apr 14 | 112,364.20 | M. D. Metals, IN ACH Pmt 230414 11016202193 | | 300 |
| Apr 14 | 500,000.00 | Valiant Steel & Equipment Inv # 7154 | | 869 |
| Apr 14 | 22,774.35 | Priefert Mfg Corp Pay V-021290 | | 429 |
| Apr 18 | 49,074.00 | Wire # 004737 Org Davis Gate & W Fed # 000438 | | 510 |
| Apr 18 | 21,471.25 | Mvss 1791 Mvspayment Rapme | | 777 |
| Apr 20 | 32,782.97 | Amg Resources Check 230419 Cw16500 | | 784 |
| Apr 20 | 1,232.07 | Scott Steel Llc Vendor 1 Rm | | 606 |
| Apr 21 | 103,909.24 | I.E.S. Sales & Service Corp Paymt44587 | | 415 |
| Apr 21 | 90,487.50 | Priefert Mfg Corp Pay V-021290 | | 257 |
| Apr 25 | 34,570.00 | Mvss 1791 Mvspayment Rapme | | 948 |
| Apr 26 | 69,980.08 | Scott Steel Llc Vendor 1 Rm | | 391 |
| Apr 26 | 365,250.24 | Advance Steel Co. ACH Pmt 11665098911 | | 102 |
| Apr 30 | 68,226.75 | Royal Canadian Steel Co. ACH Vendor CDN | | 587 |
| Apr 30 | 600,000.00 | Valiant Steel & Equipment Inv # 7155 | | 869 |

**Total Electronic Deposits: $2,219,769.95**

**Total Number of Electronic Deposits: 19**

### Checks paid this statement period

\* Symbol indicates a break in check number sequence

# Symbol indicates an original item not enclosed

@ Symbol indicates a break in check number sequence and an original item not enclosed

| Check Number | Amount | Date Paid | Bank Reference Number | Check Number | Amount | Date Paid | Bank Reference Number |
|---|---|---|---|---|---|---|---|
| #15221 | -200,000.00 | Apr 03 | 439 | @15224 | -120,000.00 | Apr 17 | 753 |
| #15222 | -100,000.00 | Apr 13 | 010 | #15225 | -200,000.00 | Apr 25 | 701 |

**Total checks paid this statement period: -$620,000.00**

**Total number of checks paid this statement period: 4**

### Electronic withdrawals this statement period

| | | | Reference | numbers |
|---|---|---|---|---|
| Date | Amount ($) | Activity | Customer | Bank |
| Apr 03 | -598.44 | Capital One Auto Directpay | | 565 |
| Apr 05 | -27,703.74 | Paychex Eib Invoice 230405 X01773100001981 | | 088 |
| Apr 11 | -23,255.01 | Paychex Eib Invoice 230411 X01843000001408 | | 706 |
| Apr 18 | -25.00 | Paychex Eib Invoice 230418 X01943300000356 | | 163 |
| Apr 19 | -6.95 | Comerica Online Billingfee Ckf148688831pos | | 146 |
| Apr 19 | -23,255.01 | Paychex Eib Invoice 230419 X01952700001360 | | 955 |
| Apr 26 | -23,255.01 | Paychex Eib Invoice 230426 X02043600001814 | | 964 |
| Apr 26 | -1,312,807.23 | Steel Dynamics Sinton Corp PayX03021475991 | | 489 |

**Total ElectronicWithdrawals: -$1,410,906.39**

**Total Number of Electronic Withdrawals: 8**

Document Submitted for Filing to MI Oakland County 6th Circuit Court.



# Small Business Checking: ███3507

## Other withdrawals this statement period

**Bank reference number**

| Date | Amount ($) | Activity | |
|------|-----------|----------|---|
| Apr04 | -9,910.00 | Withdrawal | ███ 875 |

**Total Other Withdrawals: -$9,910.00**

**Total Number of Other Withdrawals: 1**

## Fees and service charges this statement period

**Bank reference number**

| Date | Amount ($) | Activity | |
|------|-----------|----------|---|
| Apr 13 | -8.50 | Service Charge | ███ 176 |

**Total Fees and Service Charges: -$8.50**

**Total Number of Fees and Service Charges: 1**

### $ Lowest daily balance

Your lowest daily balance this statement period was **$25,997.21** on **April 13, 2023**.

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

# Exhibit D
(Demand for Payment and Acceleration Notice)

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

**BANK OF AMERICA, N.A.**
One Bryant Park
New York, New York 10036

**NOTICE OF ADDITIONAL EVENTS OF DEFAULT,
ACCELERATION AND DEMAND FOR PAYMENT**

July 5, 2023

**Via Email; Federal Express and In-Person Delivery**

RAPID METALS, LLC
7031 Orchard Lake Road, Suite 203
W. Bloomfield, Michigan 48322
Attn: Dan Butler
Email: danb@rapidmetals..com

 Re: Notice of Additional Events of Default, Acceleration and Demand for Payment

Dear Mr. Butler:

 Reference is made to the revolving line of credit from BANK OF AMERICA, N.A, a national banking association ("**Lender**") to RAPID METALS, LLC, a Michigan limited liability company ("**Borrower**") in the original principal amount of Thirty Million Dollars ($30,000,000.00). The revolving line of credit was made pursuant to the terms of that certain Loan and Security Agreement, dated November 9, 2022, by and between Borrower and Lender (as modified and amended from time to time, the "**Loan Agreement**"). Capitalized terms used in this letter and not otherwise defined shall have the meanings attributed to them in the Loan Agreement.

 We also refer to our letter, dated June 12, 2023 ("**Notice of Default**"), in which we furnished notice to you that certain Events of Default had occurred under the Loan Agreement as a result of Borrower's non-compliance with sections 8.1, 8.2, 10.1.2(a), 10.1.2(b)(i), 10.1.2(c), 10.1.2(f) and 10.1.2(e) (collectively, the "**Existing Specified Defaults**").

 Since the Notice of Default, it has come to the attention of Lender that additional Events of Default have occurred. Specifically, the following additional Events of Default have been discovered (collectively, the "**New Specified Defaults**" and together with the Existing Specified Defaults, collectively the "**Specified Defaults**"):

 (a) Following Lender's review of certain documents provided by Borrower to Lender's field examiner (including, without limitation, invoices, bills of lading and various collateral reports) and as confirmed by the Lender's field examiner, the Lender has determined that Borrower has repeatedly submitted Borrowing Base Reports that (1)

7526495.5

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

include Accounts as Eligible Accounts that are not in fact Eligible Accounts or (2) increased the value of Accounts, in each case, thereby inflating the amount of the Borrowing Base based on material misrepresentations as to an Account's eligibility or amount in order to induce Lender to increase its Loans to Borrower. Each instance of reporting false, misleading and/or inaccurate information by Borrower to Lender with respect to its Accounts constituted an Event of Default under the Loan Agreement, including, without limitation, under Section 9.2 and Section 11.1(b) thereof.

(b) Following Lender's review of inventory reporting documents provided by Borrower to Lender's field examiner, as well as the results of an inventory test count performed at one of Borrower's locations, Lender has determined that Borrower repeatedly submitted Borrowing Base Reports that overstated the value of Inventory at certain locations by assigning value to Inventory that was not present at such locations or which had a zero quantity. Each instance of reporting false, misleading and/or inaccurate information by Borrower to Lender with respect to its Inventory constituted an Event of Default under the Loan Agreement, including, without limitation, under Sections 8.3.1, 9.2 and 11.1(b) thereof.

(c) Following Lender's review of bank statements provided by Borrower to Lender's field examiner in respect of the Comerica Account, Lender has determined that (1) Borrower is not using the Comerica Account exclusively for payroll purposes and repeatedly uses the Comerica Account as a collection account and disbursement/operating account, and (2) Borrower has repeatedly allowed the balance to exceed $100,000 and has not swept excess amounts to the Dominion Account. Each of the foregoing constitutes an Event of Default under Sections 8.5(b) and 10.1.8 of the Loan Agreement.

As a result of the Specified Defaults, in accordance with the terms of the Loan Agreement, Lender hereby declares the Commitment terminated and the entire unpaid principal amount of the Loan, and all interest accrued and unpaid thereon, and all other Obligations owing under the Loan Agreement and Loan Documents, to be immediately due and payable. As of today's date, the outstanding principal and accrued interest in respect of the Loan is $19,873,528.57, plus all interest, fees, costs, expenses and other Obligations accrued, accruing and/or chargeable with respect thereto. Please be advised that (1) interest on the Obligations may, at our election incur interest at the Default Rate from the earliest date on which any Event of Default occurred following the Closing Date, irrespective of whether the rate of such interest on or after such date was previously calculated using a rate other than the Default Rate, and (2) you will continue to be responsible for all reimbursement obligations required under the Loan Agreement (including, without limitation, all of Lender's legal, accounting, appraisal, examination, consulting, and other fees and expenses incurred in connection with Lender's collection and enforcement efforts both prior to and after the date hereof).

Pursuant to Section 9-609 of the Uniform Commercial Code, and without limiting any other rights or remedy of Lender under the Loan Agreement and Loan Documents, applicable law or otherwise, Lender hereby **demands** the Borrower immediately make available to Lender all Collateral for repossession (including, without limitation, access to and turnover of

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Borrower's books and records).  Failure to turnover the Collateral shall constitute an additional Event of Default under the Loan Agreement.

This letter is without prejudice to the rights and remedies of Lender arising under or in connection with the Loan Agreement, Loan Documents or applicable law, all of which rights and remedies are hereby expressly reserved, including, without limitation, (i) to assert the existence of any additional Defaults or Events of Default, (ii) to commence any legal proceeding to collect any or all of the Obligations, and (iii) to foreclose, replevy or otherwise realize on any or all of the Collateral.  The above is not a full statement by the undersigned of all facts, claims or rights involved, all of which are hereby expressly reserved.

[Signature Page Follows]

Document Submitted for Filing to MI Oakland County 6th Circuit Court.

Very truly yours,

BANK OF AMERICA, N.A.

By: _Steve M. Siravo_
Name: Steve M Siravo
Title: SVP

Document Submitted for Filing to MI Oakland County 6th Circuit Court.